**CONSERVATION FORCE, INC., Plaintiff,**

and

**Lawrence Montoya; Filberto Valerio; Carole Jean Taulman, Plaintiffs– Appellants,**

v.

**Dennis MANNING, in his official capacity; Michael Golightly, in official capacity; Herb Guenther, in official capacity; William Berlat, in official capacity; M. Jean Hassell, in official capacity; Linda Melker, Defendants– Appellees.**

**Lawrence Montoya; Filberto Valerio; Carole Jean Taulman, Plaintiffs– Appellants,**

v.

**Dennis Manning, in his official capacity; Michael Golightly, in official capacity; Herb Guenther, in official capacity; William Berlat, in official capacity; M. Jean Hassell, in official capacity; Linda Melker; Duane R. Shroufe, Defendants–Appellees.**

Nos. 00–17082, 00–17394.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Dec. 6, 2001.

Filed Aug. 20, 2002.

James R. Scrantino, Albuquerque, NM, and Sherman Fogel, Fogel and Lamber, Phoenix, AZ, for the plaintiffs-appellants.

Jay R. Adkins, Assistant Attorney General, Phoenix, AZ, for the defendants-appellees.

Before: B. FLETCHER, BOOCHEVER and FISHER, Circuit Judges.

FISHER, Circuit Judge.

This case requires us to determine whether Arizona's 10% cap on nonresident hunting of bull elk throughout the state and of antlered deer north of the Colorado River substantially affects commerce such that the dormant Commerce Clause applies to the regulation. We hold that it does. We further hold that the regulation discriminates against interstate commerce, but that Arizona has legitimate interests in conserving its population of game and maintaining recreational opportunities for its citizens. We remand for further proceedings to determine whether Arizona has met its burden of showing that these interests could not be served adequately by reasonable nondiscriminatory alternatives.

## I.

## BACKGROUND

Arizona is home to what is considered by many hunters to be some of the best deer and elk hunting in the world, exemplified by the world record animals harvested from its lands. The part of Arizona north of the Colorado River, called the "north Kaibab" and "Arizona strip," is a particularly scenic area known for its trophy elk

and deer populations and is accordingly a location favored by hunters.

The quality of the hunting in Arizona is in large part a result of the conservation efforts supported by Arizona citizens and administered by the Arizona Department of Game and Fish ("Department"). The native Merriam elk was extirpated from Arizona in 1898. The present elk population descends from the Wapiti variety introduced to Arizona in 1913. In the case of both deer and elk, the maintenance of the state's herds has been ensured over the years through strict regulation of the number of hunting permits, known as "tags," issued each year.

For many years, Arizona distributed the limited tags made available for antlered deer and bull elk hunting through a lottery without regard to the residency of the applicant.[1] In the late 1980s, however, the Department began to receive "very vocal" complaints by Arizona hunters who "object[ed] to competing with [nonresidents] to a point where they [felt] the nonresidents [were] getting more than their fair share of the opportunity, particularly [of] premium hunts." In early 1990, the Department conducted a poll of resident big game hunters and found that nearly 75% favored restricting the number of hunting tags issued to nonresidents, many expressing the opinion that nonresidents should be excluded from hunting in Arizona entirely.

In response to the pressure from Arizona hunters, the Department in 1991 amended Rule 12–4–114 of the Arizona Administrative Code to place a 10% cap on the number of tags that could be awarded to nonresidents for the hunting of bull elk throughout the state and for antlered deer in the area north of the Colorado River.[2]

The Concise Explanatory Statement ("Statement") accompanying the regulation explained that between 1984 and 1989, the number of nonresidents receiving hunting tags for antlered deer north of the Colorado River ranged between 9% and 19%. It also showed that average nonresident receipt of bull elk tags remained below 6%, but was higher than 10% for some hunts. It explained that "the continued management of Arizona's big game is dependant on the continued support of Arizona residents" and, citing the results of the 1990 survey showing "overwhelming support for a cap on nonresident hunters," stated its objective as giving "Arizona residents ... the opportunity to hunt Arizona's best."

The Statement explained that "10% was chosen to be consistent with other limits on buffalo and bighorn sheep already established" in Arizona. It also stated that "most states have some type of nonresident restriction in hunts for species that are sought after." According to Department officials, the 10% cap was imposed because it is "comparable with systems of limitations that are placed upon [Arizona residents] when they are a nonresident [sic] in another state." *Cf. Terk v. Ruch,* 655 F.Supp. 205, 207, 210–11 (D.Colo.1987) (upholding 10% cap on nonresident recreational hunting permits for sheep and goat in Colorado and commenting that "[m]ore than twenty states either allocate their licenses unevenly, or completely prohibit nonresidents from hunting certain species").

In addition to the 10% cap, the Department adopted a bonus point system for the tag lottery. Ariz. Admin. Code R12–4–107

1. Only antlered deer and bull elk, the favored targets of big game hunters because of their size, scarcity and "trophy" of antlers, are subject to the restrictions at issue in this case.

2. According to the Department, Arizona hunters are thought of as its "consumer base"; "our customers." Department officials justify the nonresident cap as "an attempt to reward Arizona's citizens for their ongoing support."

(1991). A bonus point is earned for each year in which the applicant purchased an Arizona hunting license and unsuccessfully applied for a tag, with one additional point awarded for the completion of an approved hunter education course. In the tag lottery, hunters indicate their desired hunts and each is assigned a random number by a computer, plus an additional number for each bonus point. The lowest numbers in the pool for each hunt obtain the available tags, with the exception that higher-number-holding residents may bypass lower-number-holding nonresidents once the 10% cap on nonresidents is reached for that hunt. In addition, the first 10% of tags for each hunt are awarded to the applicants with the most bonus points, regardless of the random number drawn. Although there is no nonresident restriction in the award of bonus points, Arizona residents appear to receive the most points and dominate the award of tags in the 10% bonus point set-aside.

■ Each plaintiff is a professional hunter and guide residing in New Mexico who applies for hunting tags around the country in order to obtain the meat of the animals, their hide, their ivories, and especially their head and rack of antlers to profit from the sale and use of the nonedible parts. Plaintiffs have applied for Arizona tags to hunt bull elk as well as antlered deer north of the Colorado River for this commercial purpose, but have never received a tag. They intend to continue applying for tags for hunts restricted by the 10% cap. In the hunts between 1997 and 1999 in which the plaintiffs applied for tags, nonresidents constituted between 15% and 51% of the applicants and received between 6% and 10% of the tags.[3]

Arizona law prohibits the commercial exchange of the edible portions of a harvested animal, but allows the sale of the nonedible portions. There is an interstate and international market for the antlers and hides of deer and elk. Poor quality elk antlers, largely supplied by ranches raising elk for this purpose, are sent to Korea where they are processed into a nutritional supplement. Better quality antlers of elk and deer, almost entirely supplied by hunters, are used for display and for creating art and furniture and can sell for hundreds to thousands of dollars, up to $50,000 for the very best.

Plaintiffs' suit originally claimed that the Arizona regulation violated the Commerce, Privileges and Immunities and Equal Protection Clauses of the U.S. Constitution and requested a declaration of invalidity as well as damages. The district court granted the Department's cross-motion for summary judgment on the Commerce Clause claim. Plaintiffs voluntarily dismissed the remaining counts of their complaint and filed this appeal. We review the grant of summary judgment de novo. *See Lite–On Peripherals, Inc. v. Burlington Aire Express, Inc.*, 255 F.3d 1189, 1192 (9th Cir. 2001), *cert. denied*, 534 U.S. 1129, 122 S.Ct. 1067, 151 L.Ed.2d 970 (2002).

## II.

## DISCUSSION

The Supreme Court's "negative" or "dormant" Commerce Clause jurisprudence is forged from the tension between the Constitution's commitments that our nation be united, free of "conflict[ing] ... commercial regulations, destructive to the harmony of the States," *Gibbons v. Ogden*,

---

**3.** We agree with the district court that these facts are sufficient to satisfy the elements of standing. *See N.E. Fla. Chapter, Associated Gen. Contractors of Am. v. City of Jacksonville*,

508 U.S. 656, 666, 113 S.Ct. 2297, 124 L.Ed.2d 586 (1993) (holding that "inability to compete on an equal footing" is a sufficient injury in fact for purposes of standing).

22 U.S. (9 Wheat.) 1, 224, 6 L.Ed. 23 (1824) (Johnson, J., concurring), and that it be composed of states, "that without certain residency requirements ... would cease to be the separate political communit[ies] that history and the constitutional text make plain w[ere] contemplated." *Supreme Court of New Hampshire v. Piper*, 470 U.S. 274, 282 n. 13, 105 S.Ct. 1272, 84 L.Ed.2d 205 (1985) (internal quotation marks and citation omitted).

Under the Articles of Confederation, the balance decidedly favored the autonomy of states with the result that "[w]hen victory relieved the Colonies from the pressure for solidarity that war had exerted, a drift toward anarchy and commercial warfare between states began" in which "each state would legislate according to its estimate of its own interests, the importance of its own products, and the local advantages or disadvantages of its position in a political or commercial view." *H.P. Hood & Sons, Inc. v. Du Mond*, 336 U.S. 525, 533, 69 S.Ct. 657, 93 L.Ed. 865 (1949) (internal quotation marks and citation omitted). The fear that this state of affairs would ultimately destroy the unity of the nation was an "immediate cause, that led to the forming of a [constitutional] convention." *Gibbons*, 22 U.S. at 224 (Johnson, J., concurring). In order "to keep the commercial intercourse among the States free from all invidious and partial restraints," *id.* at 231, the Convention included within the final constitution the Commerce Clause: "Congress shall have Power ... [t]o regulate Commerce ... among the several States." U.S. Const. art. I, § 8, cls. 1, 3.

■ Although the Commerce Clause is phrased as an affirmative grant of regulatory power to Congress, the Supreme Court "has advanced the solidarity and prosperity of this Nation" by giving meaning to the Clause's "great silences." *H.P. Hood*, 336 U.S. at 535. Thus, the Court has interpreted Congress' authority to regulate commerce "to its utmost extent," *Gibbons*, 22 U.S. at 196, and has long interpreted the Clause to have a "negative aspect," referred to as the dormant Commerce Clause, "that denies the States the power unjustifiably to discriminate against or burden the interstate flow of articles of commerce." *Or. Waste Sys., Inc. v. Dep't of Envtl. Quality*, 511 U.S. 93, 98, 114 S.Ct. 1345, 128 L.Ed.2d 13 (1994); *see Cooley v. Bd. of Wardens*, 53 U.S. (12 How.) 299, 318, 13 L.Ed. 996 (1851), *overruled on other grounds by Complete Auto Transit, Inc. v. Brady*, 430 U.S. 274, 97 S.Ct. 1076, 51 L.Ed.2d 326 (1977).[4] The Court, however, also has striven to interpret the Clause to avoid hampering any state's "ability to structure relations exclusively with its own citizens." *Reeves, Inc. v. Stake*, 447 U.S. 429, 441, 100 S.Ct. 2271, 65 L.Ed.2d 244 (1980); *see also H.P. Hood*, 336 U.S. at 533–34 (explaining that "[t]he desire of the Forefathers to federalize regulation of foreign and interstate commerce stands in sharp contrast to their jealous preservation of [states'] power over their internal affairs"). Thus, the Court has "struggled (to put it nicely) to develop a set of rules by which we may preserve a national market without needlessly intruding upon the States' police powers, each exercise of which no doubt has some effect on the commerce of the Nation." *Camps Newfound/Owatonna, Inc. v. Town of Harrison*, 520 U.S. 564, 596, 117 S.Ct. 1590, 137 L.Ed.2d 852 (1997) (Scalia, J., dissenting).

---

4. This expansive reading of the Commerce Clause and its goals is derived in part from the writings of James Madison, one of the Clause's chief architects. 1 Laurence H. Tribe, American Constitutional Law § 6–3, at 1044–45 (3d ed.2000) (explaining the "Madisonian" roots of the Court's interpretation of the Commerce Clause).

We turn first to whether the dormant Commerce Clause applies to Arizona's cap on nonresident hunting. Contrary to the finding of the district court, we hold that it does and therefore proceed to apply the Supreme Court's guidelines for determining whether Arizona's regulation unjustifiably discriminates against or burdens interstate commerce. *See, e.g., Town of Harrison*, 520 U.S. at 572–77 (considering first whether the dormant Commerce Clause applied and then whether challenged law impermissibly discriminated against interstate commerce); *C & A Carbone, Inc. v. Town of Clarkstown*, 511 U.S. 383, 389–90, 114 S.Ct. 1677, 128 L.Ed.2d 399 (1994) (applying similar analysis).

### A. Applicability of the dormant Commerce Clause.

■ The district court concluded that the Commerce Clause does not apply to Arizona's regulation of hunting tags because hunting is "recreation," which is not "a form of interstate commerce," and because parts of elk and deer do not become articles of commerce until they are "reduced to possession" by a hunter. The district court based these conclusions on the Supreme Court's holding in *Baldwin v. Fish & Game Comm'n*, 436 U.S. 371, 388, 98 S.Ct. 1852, 56 L.Ed.2d 354 (1978), that recreational hunting is not one of the fundamental rights protected by the Privileges and Immunities Clause, U.S. Const. art. IV, § 2, cl. 1,[5] and its statement in *Hughes v. Oklahoma*, 441 U.S. 322, 99 S.Ct. 1727, 60 L.Ed.2d 250 (1979), that "when a wild animal 'becomes an article of commerce ... its use cannot be limited to the citizens of one State to the exclusion of citizens of another State,'" *id.* at 339 (quoting *Geer v. Connecticut*, 161 U.S. 519, 538, 16 S.Ct. 600, 40 L.Ed. 793 (1896) (Field, J., dissenting)).[6]

The question before the Supreme Court in *Fish & Game Comm'n* was whether the Privileges and Immunities Clause applied to a Montana law charging out-of-state residents a higher fee for recreational elk hunting licenses. The Court held that the Privileges and Immunities Clause does not apply to such a law because that clause addresses only distinctions in the exercise of those fundamental rights "bearing upon the vitality of the Nation as a single entity," such as burdens on the pursuit of common callings, the ownership and disposition of privately held property and access to the courts. 436 U.S. at 383. The Court concluded that Montana's regulation "simply does not fall within the purview of the Privileges and Immunities Clause" because "[e]lk hunting by nonresidents in Montana is a recreation and a sport ... not a means to the nonresident's livelihood." *Id.* at

**5.** "The Citizens of each State shall be entitled to all Privileges and Immunities of Citizens in the several States."

**6.** Other courts have adopted similar reasoning in cases where, unlike in Arizona, the state prohibits the sale of all parts of the animal harvested. *See Terk*, 655 F.Supp. at 215 (refusing to apply dormant Commerce Clause to nonresident cap on sheep and goat hunting because "Sheep and Goat are not commerce. In fact, it is illegal to sell them."); *Shepherd v. Alaska*, 897 P.2d 33, 42 (Ak.1995) (reasoning that "unharvested game is not an article of commerce ... where the game, after its taking, is still not destined for interstate commerce"); *cf. U.S. v. Romano*, 929 F.Supp. 502, 509 (D.Mass.1996) ("Recreational hunting is not commerce."). The Supreme Court has indicated, however, that even wild animals "killed for the purposes of food" may be articles of commerce for the purposes of dormant Commerce Clause analysis. *Hughes*, 441 U.S. at 329 (quoting *Geer*, 161 U.S. at 541 (Field, J., dissenting)); *cf. Wickard v. Filburn*, 317 U.S. 111, 127–29, 63 S.Ct. 82, 87 L.Ed. 122 (1942) (holding that home consumption of wheat, by allowing users to forego purchases in the interstate market, substantially affects interstate commerce).

388. "Whatever rights or activities may be 'fundamental' under the Privileges and Immunities Clause," the Court stated, "we are persuaded, and hold, that elk hunting by nonresidents in Montana is not one of them." *Id.*

 *Fish & Game Comm'n* does not foreclose application of the dormant Commerce Clause here. Although the Commerce and Privileges and Immunities Clauses have a "mutually reinforcing relationship" stemming "from their common origin in the Fourth Article of the Articles of the Confederation and their shared vision of federalism," *Hicklin v. Orbeck,* 437 U.S. 518, 531–32, 98 S.Ct. 2482, 57 L.Ed.2d 397 (1978) (footnote omitted), the analytical framework for addressing challenges under each clause is not identical. To determine whether the dormant Commerce Clause is applicable, we ask not whether the activity regulated is a right fundamental to the vitality of the nation as a single entity, but whether it has a "substantial effect" on interstate commerce such that Congress could regulate the activity.[7] *Camps,* 520 U.S. at 574; *see also Hughes,* 441 U.S. at 326 n. 2 ("The definition of 'commerce' is the same when relied on to strike down or restrict state legislation as when relied on to support some exertion of federal control or regulation.").

In *Camps,* the Supreme Court held that a Maine law that extended beneficial tax treatment to operators of nonprofit camps that served mostly Maine residents violated the dormant Commerce Clause. 520 U.S. at 595. In so holding, the Court rejected Maine's contention, similar to that pressed by Arizona and adopted by the district court here, that regulation of recreational camping is insulated from Commerce Clause scrutiny "because the campers are not 'articles of commerce,' or more generally that interstate commerce is not at issue." *Id.* at 574. The Court called these assertions "unpersuasive" because the services of the camps, by encouraging interstate travel, "clearly have a substantial effect on commerce, as do state restrictions on making those services available to nonresidents." *Id.* Similar reasoning controls here. Like recreational camping in Maine, hunting in Arizona promotes interstate travel of people, like the plaintiffs, who want to take advantage of Arizona's excellent hunting opportunities. *Cf. Douglas v. Seacoast Prods., Inc.,* 431 U.S. 265, 282, 97 S.Ct. 1740, 52 L.Ed.2d 304 (1977) (reasoning that commercial fishing is subject to the Commerce Clause in part because "[t]he movement of vessels from one State to another in search of fish, and back again to processing plants, is certainly ac-

---

7. Contrary to the district court's finding, even if the regulated activity is not itself "a form of interstate commerce," it may still substantially effect interstate commerce and therefore be subject to the Commerce Clause. In the Supreme Court's early jurisprudence, the Court resolved dormant Commerce Clause cases by categorically distinguishing between invalid regulations of "interstate commerce" and valid exercises of "that immense mass of legislation, which embraces everything within the territory of a State, not surrendered to the general government," *Gibbons,* 22 U.S. (9 Wheat.) at 203, often referred to as the state's "police power," *Mayor of New York v. Miļn,* 36 U.S. (11 Pet.) 102, 132 (1837) (upholding requirement that vessels arriving into New York report names of passengers on ground that it was "not a regulation of commerce, but of police"). That mode of categorical reasoning came under early criticism. *See Henderson v. Mayor of New York,* 92 U.S. (2 Otto) 259, 271 (1875) ("Nothing is gained in the argument by calling it the police power."). Modern dormant Commerce Clause analysis is applicable to all police power regulation, including the core areas of health and safety protection. *See Raymond Motor Transp., Inc. v. Rice,* 434 U.S. 429, 441–43, 98 S.Ct. 787, 54 L.Ed.2d 664 (1978); *see also Dean Milk Co. v. City of Madison,* 340 U.S. 349, 354–56, 71 S.Ct. 295, 95 L.Ed. 329 (1951); *Baldwin v. G.A.F. Seelig, Inc.,* 294 U.S. 511, 523, 55 S.Ct. 497, 79 L.Ed. 1032 (1935).

tivity which Congress could conclude affects interstate commerce").

■ In addition to substantially affecting the interstate flow of people, hunting in Arizona substantially affects the interstate flow of goods in commercial markets. Congress has noted, in another context, that regulation of hunting "endangered species of wildlife with some commercial value" affects interstate commerce, because with "controlled exploitation ... business[es] may profit from the trading and marketing of that species ..., where otherwise it would have been completely eliminated from commercial channels." S.Rep. No. 91–526 (1969), *reprinted in* 1969 U.S.C.C.A.N. 1413, 1415.[8] The hunting that is regulated by Arizona's cap on nonresident tags is not restricted to that conducted for recreational or subsistence purposes, and in this way Arizona's scheme differs from Montana's regulations at issue in *Fish & Game Comm'n.*[9] Arizona allows the nonedible portions of bull elk and antlered deer taken from its lands to be sold in interstate and international markets and therefore Arizona's regulation of hunting has a substantial effect on the flow of goods through the channels of interstate commerce. By disadvantaging nonresident hunters who seek to engage in this commercial pursuit, Arizona burdens interstate commerce at its point of supply. It is thus similar to regulations of the commercial harvesting of other natural resources such as gas, *West v. Kan. Natural Gas Co.*, 221 U.S. 229, 31 S.Ct. 564, 55 L.Ed. 716 (1911), and fish, *Foster–Fountain Packing Co. v. Haydel,* 278 U.S. 1, 49 S.Ct. 1, 73 L.Ed. 147 (1928), that the Supreme Court has consistently held are subject to the dormant Commerce Clause.

■ The statement in *Hughes* that "when a wild animal becomes an article of commerce ... its use cannot be limited to the citizens of one State to the exclusion of citizens of another" is not to the contrary. *Hughes,* 441 U.S. at 339(quoting *Geer,* 161 U.S. at 538 (1896) (Field, J., dissenting)). That statement was made in the context of clarifying that the Court would thenceforth apply "to state regulations of wild animals ... the same general rule applied to state regulations of other natural resources." *Hughes,* 441 U.S. at 335; it was not creating a temporal demarcation in an animal's commercial status.[10] Under the general rule applied to regulations of natural resources, differential burdens on out-of-state access to natural resources are subject to the dormant Commerce Clause whenever the burden substantially affects interstate commerce, even if the resource

8. This report accompanied a reauthorization of the Lacey Act, making it "unlawful for any person to import, export, transport, sell, receive, acquire, or purchase in interstate or foreign commerce any fish or wildlife taken, possessed, transported, or sold in violation of any law or regulation of any State or in violation of any foreign law." 16 U.S.C. § 3372(a)(2)(A). Even where the species hunted has no current commercial value, Congress may regulate under its Commerce Clause authority to "prevent[ ] the destruction of biodiversity and thereby protect[ ] the current and future interstate commerce that relies upon it." *Nat'l Ass'n of Home Builders v. Babbitt,* 130 F.3d 1041, 1052 (D.C.Cir.1997) (upholding the Endangered Species Act as a valid exercise of Congress' Commerce Clause authority).

9. In *Fish & Game Comm'n,* the Court explained that "[e]lk are not hunted commercially in Montana," there being "statutory restrictions ... on the buying and selling of game animals, or parts thereof." 436 U.S. at 375 & n. 11.

10. *Hughes* overruled *Geer,* which upheld a ban on the killing of certain wild birds for the purposes of interstate export on the theory that the state owned the wild animals within its borders and thus had the "right to keep the property, if the sovereign so chooses, always within its jurisdiction for every purpose." 161 U.S. at 530.

itself, such as the beauty of Maine's lakes, *Camps*, 520 U.S. at 574, is not an article of commerce per se. The Supreme Court has never construed *Hughes* to exempt from dormant Commerce Clause scrutiny state discrimination in the harvesting of resources destined for interstate commerce. To the contrary, "[f]or over 150 years, our cases have rightly concluded that the imposition of a differential burden on any part of the stream of commerce ... is invalid." *W. Lynn Creamery, Inc. v. Healy*, 512 U.S. 186, 202, 114 S.Ct. 2205, 129 L.Ed.2d 157 (1994). Thus, even though fishing, like hunting, is an activity that takes place before the animal becomes an article of commerce, the Supreme Court explained in *Douglas* that the "proliferation of residency requirements for commercial fishermen would create precisely the sort of Balkanization of interstate commercial activity that the Constitution was intended to prevent." *Douglas*, 431 U.S. at 285–86.

We conclude that because hunting of bull elk and antlered deer in Arizona substantially affects interstate commerce, as do Arizona's restrictions on that hunting by nonresidents, the dormant Commerce Clause is applicable here.

### B. *Validity of Arizona's nonresident cap.*

■ Our conclusion that Arizona's regulation of hunting substantially affects interstate commerce does not answer the question of whether the regulation violates the dormant Commerce Clause. The existence of unexercised federal regulatory power does not categorically foreclose state regulation. *Sporhase v. Nebraska*, 458 U.S. 941, 954, 102 S.Ct. 3456, 73 L.Ed.2d 1254 (1982). The Supreme Court's decisions yield two lines of analysis to determine whether Arizona's regulation is valid despite its substantial effect on interstate commerce: the first where the state discriminates against interstate commerce; the second where the state regulates evenhandedly but nevertheless imposes some burden on interstate commerce. *C & A Carbone*, 511 U.S. at 389–90.

■ A state discriminates against interstate commerce by treating differently in-state and out-of-state economic interests, including consumers of natural resources, such that the regulation benefits the former and burdens the latter. *Or. Waste Sys.*, 511 U.S. at 99. Where discrimination exists, the regulation is subject to strict scrutiny under which it is the state's burden to show that the discrimination is narrowly tailored to further a legitimate interest. *Sporhase*, 458 U.S. at 957–58. On the other hand, if the state regulates evenhandedly, the regulation is valid unless the plaintiff can show that it imposes a burden on interstate commerce "clearly excessive in relation to the putative local benefits." *Pike v. Bruce Church, Inc.*, 397 U.S. 137, 142, 90 S.Ct. 844, 25 L.Ed.2d 174 (1970).

■ The district court held that, even if the dormant Commerce Clause applied to Arizona's cap on nonresident hunting, the plaintiffs failed to show under *Pike* that the cap imposed a burden on interstate commerce clearly excessive in relation to its putative local benefits. We disagree with the district court's conclusion that *Pike* was the appropriate standard to apply because Arizona's cap on nonresident hunting licenses is not an even-handed regulation. It restricts access to Arizona's population of bull elk and antlered deer based on whether the hunter is a resident of Arizona. This overt discrimination in access to Arizona's resources is subject to the strictest scrutiny under the dormant Commerce Clause. *City of Philadelphia v. New Jersey*, 437 U.S. 617, 627, 98 S.Ct. 2531, 57 L.Ed.2d 475 (1978); *cf. Camps*, 520 U.S. at 578("By encouraging

economic isolationism, prohibitions on out-of-state access to in-state resources serve the very evil that the dormant Commerce Clause was designed to prevent."). We must therefore analyze whether Arizona has met its burden, as a matter of law, of demonstrating that its cap on nonresident hunting is narrowly tailored to serve legitimate interests of the state.

### 1. *Legitimate interests.*

■ We turn first to whether Arizona has set forth legitimate interests for its regulation of hunting. Although the Supreme Court has adopted a broad construction of the applicability of the dormant Commerce Clause, it has cautioned that "[t]he Commerce Clause ... does not elevate free trade above all other values." *Maine v. Taylor*, 477 U.S. 131, 151, 106 S.Ct. 2440, 91 L.Ed.2d 110 (1986). States have broad powers to regulate in the interests of their citizens.

■ Arizona's cap on nonresident hunting was designed to serve its interests in conserving the population of game on its lands while maintaining recreational hunting opportunities for its citizens. These interests are unquestionably legitimate. The protection of wildlife and other natural resources of a state are some "of the state's most important interests." *Pac. N.W. Venison Producers v. Smitch*, 20 F.3d 1008, 1013 (9th Cir.1994); *see also Taylor*, 477 U.S. at 151("[Each state] retains broad regulatory authority to protect the health and safety of its citizens and the integrity of its natural resources."); *Kleppe v. New Mexico*, 426 U.S. 529, 545, 96 S.Ct. 2285, 49 L.Ed.2d 34 (1976) ("Unquestionably the States have broad trustee and police powers over wild animals within their jurisdictions."). It has also long been recognized that a state has a legitimate interest in providing "enjoyment to its own people." *Toomer v. Witsell*, 334 U.S. 385,

409, 68 S.Ct. 1156, 92 L.Ed. 1460 (1948) (Frankfurter, J., concurring).

■ A state may have additional interests in granting "in times of severe shortage ... a limited preference for its own citizens in the utilization of [a] resource" that, through the state's conservation efforts, "has some indicia of a good publicly produced and owned." *Sporhase*, 458 U.S. at 956–57. Thus, in *Sporhase*, the Court held that Nebraska's restrictions on exporting water from the state in times of shortage did not violate the Commerce Clause, *id.* at 956, noting that "[a] demonstrably arid State conceivably might be able to marshal evidence to establish a close means-end relationship between even a total ban on the exportation of water and a purpose to conserve and preserve water." *Id.* at 958. It is undisputed that Arizona's game supply is limited and that its continued vitality is a product of the State's conservation efforts. But these factors alone do not justify a preference for Arizona citizens in access to Arizona's game.

■ Where the resource in question is "produced" by conservation, rather than being "the end product of a complex process [by the state] whereby a costly physical plant and human labor act on raw materials," *Reeves*, 447 U.S. at 444, scarcity of the resource does not itself justify discrimination against out-of-state residents. Thus, the Supreme Court struck down New Jersey's effort to "saddle those outside the State with the entire burden of slowing the flow of refuse into New Jersey's remaining landfill sites," although it recognized that landfill space was a "scarce resource" the state was striving to conserve. *City of Philadelphia*, 437 U.S. at 628–29. Similarly, the Court has struck down efforts to preserve for the state's own citizens the use of hydroelectric power, *New England Power Co. v. New*

*Hampshire,* 455 U.S. 331, 338, 102 S.Ct. 1096, 71 L.Ed.2d 188 (1982), and natural gas, *Pennsylvania v. West Virginia,* 262 U.S. 553, 594, 43 S.Ct. 658, 67 L.Ed. 1117 (1923); *Kan. Natural Gas Co.,* 221 U.S. at 255–56, although those resources undeniably are scarce and produced through conservation as well.

An important difference noted in *Sporhase* is that water is a "vital resource" the regulation of which directly serves "the purpose of protecting the health of its citizens," an interest that lies "at the core of its police power." *Id.* at 956; *see also Or. Waste Sys.,* 511 U.S. at 107(describing *Sporhase* as "premised on several different factors tied to the simple fact of life that 'water, unlike other natural resources, is essential for human survival' ") (quoting *Sporhase,* 458 U.S. at 952). Arizona has not asserted that its cap on nonresident hunting is designed to protect an important and traditional food source for its citizens, which might similarly lie at the core of its police power. *See Toomer,* 334 U.S. at 409(Frankfurter, J., concurring) ("It is one thing to say that a food supply that may be reduced to control by a State for feeding its own people should be only locally consumed. . . . It is a wholly different thing for the State to provide that only its citizens shall be engaged in commerce among the States, even though based on a locally available food supply. That is not the exercise of the basic right of a State to feed . . . its own people."); *Foster–Fountain Packing Co.,* 278 U.S. at 13(stating that "by permitting its shrimp to be taken and . . . shipped and sold in interstate commerce, the state necessarily releases its hold"); *cf. Shepherd,* 897 P.2d at 35(rejecting Commerce Clause challenge to Alaska law providing that "the taking of moose . . . by residents for personal and family consumption has preference over taking by nonresidents"). We therefore cannot conclude that scarcity of Arizona's game itself provides a legitimate justification for its discrimination against out-of-state hunting. We do, however, consider the fact that elk and deer in Arizona are scarce and are products of its conservation efforts as additional factors supporting the legitimacy of the state's interests in ensuring the conservation of that population and maintaining its availability for recreational hunting by Arizona's citizens.

We conclude that Arizona has met its burden under the first part of the strict scrutiny analysis. It has legitimate interests in preserving the health of its game populations and maintaining recreational hunting opportunities for its citizens. The key question in our analysis, then, is whether Arizona has met its burden under the second part of the inquiry by demonstrating that the cap is narrowly tailored to its legitimate ends.

### 2. *Narrow tailoring.*

■ The Supreme Court's narrow tailoring analysis under the dormant Commerce Clause focuses on the requirement that the state "demonstrate, under rigorous scrutiny, that it has no other means to advance a legitimate local interest." *C & A Carbone,* 511 U.S. at 392; *see also Or. Waste Sys.,* 511 U.S. at 100–01(explaining that under strict scrutiny the regulation "must be invalidated unless [the state] can show that it advances a legitimate local purpose that cannot be adequately served by reasonable nondiscriminatory alternatives") (internal quotation marks omitted); *Hughes,* 441 U.S. at 337–38 (explaining the state's burden to show, under "the strictest scrutiny," that the regulation is the "least discriminatory alternative" to advance a legitimate purpose). The district court did not address whether other means exist that could serve Arizona's interests because it concluded that the Commerce Clause did not apply to the nonresident cap and that, even if the Clause did apply,

it was the plaintiffs' obligation to show that the cap excessively burdens interstate commerce under the *Pike* balancing test applicable to evenhanded regulation. Because we hold that strict scrutiny applies to Arizona's regulation, however, it follows that Arizona bears the burden of showing that it has no other means to advance its legitimate interests.

As we noted above, the scarcity of Arizona game does not itself justify discrimination against out-of-state access to hunting. The Commerce Clause does not permit a state to "force those outside the State to bear the full costs of 'conserving' the wild animals within its borders when equally effective nondiscriminatory conservation measures are available." *Hughes*, 441 U.S. at 337. Arizona concedes the self-evident proposition that whether a resident or nonresident harvests an animal has no biological impact on the population of game. Arizona argues, however, that its cap on nonresident hunting is necessary for the conservation of its game populations because without it Arizona citizens might withdraw support from the Department's programs. To support this proposition, the state points to poll data showing that Arizona hunters are broadly supportive of the 10% cap and that many demand a total ban on nonresident hunting.

█ Arizona cannot meet its burden of showing that its cap on nonresident hunters is narrowly tailored to its conservation interest simply by demonstrating that Arizona residents desire similar or more severe restrictions on nonresident access to hunting, even if Arizona could show that residents conditioned their support of the government's programs on the adoption of such discrimination. In *Fish & Game Comm'n*, the Supreme Court rejected a similar argument, stating that under the Privileges and Immunities Clause "the State's need or desire to engender political support for its conservation programs cannot by itself justify an otherwise invidious classification." 436 U.S. at 391 n. 24. The same is true in dormant Commerce Clause analysis. The Commerce Clause, like the Privileges and Immunities Clause, was included in the Constitution to prevent state governments from imposing burdens on unrepresented out-of-state interests merely to assuage the political will of the state's represented citizens. *See* John Hart Ely, *Democracy and Distrust: A Theory of Judicial Review* 77–84 (1980).[11] The Supreme Court's application of strict scrutiny to discriminatory burdens on interstate commerce developed out of a similar recognition "that when the regulation is of such a character that its burden falls principally upon those without the state, legislative action is not likely to be subjected to those political restraints which are normally exerted on legislation where it affects adversely some interests within the state." *S.C. State Highway Dept. v. Barnwell Bros., Inc.*, 303 U.S. 177, 185 n. 2, 58 S.Ct. 510, 82 L.Ed. 734 (1938); *accord South–Central Timber Dev., Inc., v. Wunnicke*, 467 U.S. 82, 92, 104 S.Ct. 2237, 81 L.Ed.2d 71 (1984); *Southern Pac. Co. v. State of*

---

**11.** According to Professor Ely, the Privileges and Immunity Clause and the Commerce Clause ensure a system of "virtual representation" whereby states are prohibited from treating the nonrepresented less favorably than the represented:

An ethical ideal of equality is certainly working here, but the reason inequalities against nonresidents and not others were singled out in the original document is obvi-

ous: nonresidents are a paradigmatically powerless class politically. And their protection proceeds by what amounts to a system of virtual representation: by constitutionally tying the fate of the outsiders to the fate of those possessing political power, the framers insured that their interests would be well looked after.

*Id.* at 83.

*Ariz. ex rel. Sullivan,* 325 U.S. 761, 768 n. 2, 65 S.Ct. 1515, 89 L.Ed. 1915 (1945). Allowing the intensity of political will in a state to justify discrimination against non-residents would radically undermine the representation-reinforcing policies underlying the dormant Commerce Clause doctrine. To show that its discriminatory barrier to interstate commerce through denial of access to its natural resources is narrowly tailored to its legitimate interests, Arizona must show more than instate political demand for the discrimination imposed.

■■■ Nor can Arizona show that its 10% cap on nonresident hunting is narrowly tailored to serve legitimate interests because other states have similarly restricted nonresident hunting. Discrimination against interstate commerce "cannot, of course, be justified as a response to another State's unreasonable burden on commerce." *Sporhase,* 458 U.S. at 958 n. 18. If we were to uphold Arizona's set-aside because other states act in similarly discriminatory ways, we would be condoning protectionist warfare that the Commerce Clause was meant to prohibit. Montana could then reserve 90% of its trout fishing, California 90% of its beach access, Colorado 90% of its back country skiing and so on until recreational opportunities and the businesses that served them were partitioned at state lines. *Cf. Kan. Natural Gas Co.,* 221 U.S. at 255 (explaining that the Commerce Clause was meant to prevent the situation where "Pennsylvania might keep its coal, the Northwest its timber, the mining States their minerals," such that "embargo may be retaliated by embargo"); *Camps,* 520 U.S. at 576(opining that if Maine preferred camping opportunities for its own residents "by a statutory prohibition against providing camp services to nonresidents,

the statute would almost certainly be invalid").

We do not foreclose the possibility that the goal of ensuring a state's citizens' access to recreational opportunities may justify limited consideration of residency in the allocation of hunting tags in some circumstances. Whether there is a need for such consideration for hunting in Arizona turns on questions of fact not appropriate for resolution by this court. It is hardly clear that Arizonans need preferences in order to enjoy hunting in their state. The Statement accompanying the promulgation of the regulations explained that, without the cap or bonus point system, "most big game hunts ... experience nonresident pressure below 5%," and that Arizonans received over 80% of the hunting tags issued for nearly every hunt for bull elk statewide and for antlered deer north of the Colorado River. A factfinder reasonably could conclude from this evidence that Arizona's regulation was designed to respond to political pressure from the Department's constituency, not to any actual need of Arizonans for more hunting opportunities.

Even if Arizona can show that some effort is needed to ensure that its citizens have access to recreational hunting, a question of fact remains whether a cap on nonresident hunting is the "least discriminatory alternative" to serve Arizona's interests. *Hughes,* 441 U.S. at 337–38. In enacting a rigid cap on nonresident hunting, Arizona put in place a severe form of discrimination in the allocation of government benefits. Whether there are other less discriminatory means that could serve adequately Arizona's legitimate interests is a question of fact we leave to the district court in the first instance.[12]

---

12. The district court may, for example, wish to explore whether a nondiscriminatory version of Arizona's bonus point system could further its interests.

## CONCLUSION

We hold that Arizona's cap on nonresident hunting substantially affects and discriminates against interstate commerce and therefore is subject to strict scrutiny under the dormant Commerce Clause. Arizona has legitimate interests in regulating hunting to conserve its population of game and maintain recreational opportunities for its citizens. We remand for further proceedings to determine whether Arizona has met its burden of showing that it has no other means to advance its legitimate interests.

**REVERSED AND REMANDED.**