NATIONAL ASSOCIATION OF OPTOMETRISTS & OPTICIANS; Lenscrafters, Inc; and Eye Care Centers of America, Inc., Plaintiffs,

v.

Bill LOCKYER, in his official capacity as Attorney General of the State of California; and Charlene Zettel, in her official capacity as Director of the Department of Consumer Affairs, Defendants.

No. CIV. S–02–1464 LKK/DAD.

United States District Court, E.D. California.

Dec. 6, 2006.

Lori A. Schechter, Morrison & Foerster LLP, San Francisco, CA, for Plaintiffs.

Jennifer Weck, Attorney General of the State of California, San Diego, CA, for Defendants.

## ORDER

KARLTON, Senior District Judge.

Plaintiffs challenge the constitutionality of California's statutory scheme regulating the manner in which interstate optical companies sell eyewear in California. Plaintiffs are the National Association of Optometrists and Opticians ("NAOO") and two out-of-state optical companies, LensCrafters, Inc. and Eye Care Centers of America, Inc. ("ECCA"). Both LensCrafters and ECCA own numerous optical stores throughout the United States. Defendants are the Attorney General of California and the Director of the California Department of Consumer Affairs, both

sued in their official capacities.[1] Plaintiffs seek a declaration that the challenged statutory and regulatory provisions violate the Commerce Clause, Equal Protection Clause, Due Process Clause and First Amendment of the United States Constitution, and seek to enjoin enforcement of the provisions on that basis.

Currently pending before the court are motions for summary judgment filed by plaintiffs and defendants. These motions address the question of whether the challenged statutory scheme violates the dormant Commerce Clause. These motions were originally filed in 2003; however, on March 10, 2004, the entire case was stayed pending resolution of *People v. Cole*, 38 Cal.4th 964, 44 Cal.Rptr.3d 261, 135 P.3d 669 (2006).[2] On June 12, 2006, the California Supreme Court decided *Cole* and the stay in the pending case was lifted. Oral argument was heard on the pending motions prior to the stay and again on Sep-

tember 25, 2006. The court decides the matter based on the papers and after oral argument.[3]

## I.

## UNDISPUTED FACTUAL AND PROCEDURAL BACKGROUND[4]

### A. The Challenged Laws

Plaintiffs challenge three sections of California's Business & Professions Code, §§ 655, 2556 and 3130, and two companion regulations, 16 Cal.Code of Regs, Title 16 §§ 1399.251 and 1514, to the extent these provisions taken together prohibit out-of-state optical companies from offering prescription eyewear at the same location in which eye examinations are provided, and from advertising that eyewear and eye examinations are available in the same location.

Section 655 prohibits an out-of-state optical company from leasing space in its eyewear store to an optometrist.[5] Section

---

1. The Department of Consumer Affairs has supervisory powers over the Board of Optometry, which has the power to discipline optometrists, and the Medical Board of California, which has the power to discipline opticians.

2. As explained in the Court's order staying the case, a decision in *Cole* favorable to the plaintiffs here may have eliminated or narrowed the necessity for a ruling on plaintiffs' federal constitutional claims.

3. Also pending before the court are motions to file amicus curiae briefs by the California Optometric Association and Melvin Gene Snow and Sabrina Hughes. Plaintiffs filed an opposition to both motions. The court notes that the pending motions for summary judgment were filed in 2003 and several hearings have occurred in the case. The parties seeking to file amicus briefs fail to explain why they waited until the fall of 2006 to file their requests. The requests to file amicus briefs simply come too late. *See, e.g., Hawksbill Sea Turtle v. FEMA*, 11 F.Supp.2d 529, 541 (D.Vi. 1998) (denying leave to file amicus brief on grounds that the "information provided in the brief is untimely since it comes almost two

years after this action was commenced and several months after the parties completed briefing their Cross Motions for Summary Judgment."); *O Centro Espirita Beneficiente Uniao Do Vegetal v. Ashcroft*, 282 F.Supp.2d 1271, 1274 (D.N.M.2002) (denying leave to file amicus brief where pending motions had been briefed for over one year and hearing had previously been held). For these reasons, the requests to file amicus briefs are denied.

4. Undisputed unless otherwise noted. Both parties filed motions to strike certain evidence. None of the evidence at issue in the motions to strike was relied upon by the court in reaching its conclusion. Thus the motions are moot.

5. Section 655 makes it unlawful for an optician or any company that manufactures or distributes eyewear to "have any membership, proprietary interest, co-ownership, landlord-tenant relationship, or any profit-sharing arrangement in any form, directly or indirectly," with an optometrist. Cal. Bus. & Prof. Code § 655.

2556 prohibits an out-of-state optical company from furnishing the services of an optometrist on or near its optical dispensing premises. Section 2556 also prohibits non-optometrists from advertising the services of an optometrist.

## B. Plaintiffs' Allegations

Plaintiffs allege that optometrists and optical companies compete vigorously to sell eyewear in a national market. They claim that the ability to sell eyewear at the same location in which eye examinations are performed provides a significant competitive advantage. According to plaintiffs', consumers benefit from and prefer the provision of such "one-stop shopping" and patronize entities that can offer it.

Under California's statutory and regulatory scheme, in-state optometrists and ophthalmologists are permitted to sell eyewear in the same location in which eye examinations are performed, and to advertise that eyewear is sold in that manner. Plaintiffs allege that out-of-state optical companies are forbidden from competing for the same customers in the same way. Plaintiffs also allege that California's restrictive scheme harms the welfare and health of consumers, unjustly burdens plaintiffs, and provides no discernible countervailing benefits to the public.

## C. The Retail Eyewear Market

"Prescription eyewear" refers to corrective lenses and frames for eyeglasses, manufactured according to a lens prescription issued by either an optometrist or an ophthalmologist. Decl. of Roger Noll in Supp. of Pls.' Mot. for Summ. J. re: Discriminatory Effect ("Noll Decl.") at ¶ 11. In California, an eye examination must be performed by an optometrist, licensed by the California Board of Optometry, see Cal. Bus. & Prof.Code §§ 3010, 3041.2, 3055, or by an ophthalmologist, a medical doctor specializing in treating eye disease, licensed by the Medical Board of Califor-

nia, see Cal. Bus. & Prof.Code §§ 2003, 2050. An optometrist or ophthalmologist will write a lens prescription, which is then used to manufacture lenses for frames (and/or contact lenses). Noll Decl. at ¶ 12.

A consumer may purchase eyewear from among the following professionals:

### 1. Dispensing Optometrists/Registered Dispensing Optometrists

Many optometrists licenced in California sell eyewear as part of their services. Noll Decl. at ¶ 14. They offer "one-stop shopping" in that a patient can get his or her eyes examined and purchase glasses in the same location.

Defendants' expert, Lawrence Thal, O.D., former President of the California Optometric Association and former President of the California Board of Optometry, estimates that over 90 percent of optometrists in private practice sell eyewear. Dep. of Lawrence Thal Vol. I ("Thal Dep. I") at 116:25–118:9, 129:13–15, Ex. 6 of Decl. of Lori Schechter in Supp. of Mot. Pls.' for Summ. J. re: Discriminatory Effect ("Schechter Decl. re: Discriminatory Effect"); Dep. of Lawrence Thal Vol. II ("Thal Dep. II") at 394:23–395:6, Ex. 7 of Schechter Decl. re: Discriminatory Effect. Such optometrists are referred to as "dispensing" optometrists, or registered dispensing optometrists ("RDOs").

In 2001, dispensing optometrists accounted for approximately 31 percent of optical retail sales nationwide. Noll Decl. at ¶ 14. Plaintiff's expert, Gary Ford, however, explains that in California, this percentage is likely much larger, as a recent California survey showed that 60 percent of consumers last purchased their eyewear from a dispensing optometrist. Decl. of Gary T. Ford in Supp. of Pls.' Mot. for Summ. J. re: Discriminatory Effect ("Ford Decl.") at ¶ 9.

Plaintiffs maintain that dispensing optometrists derive a significant portion of their income from the sale of eyewear. It is estimated that the percentage of gross income for dispensing optometrists derived from the sale of eyewear exceeds 50 percent. The percentage of net income is estimated at approximately 25 percent. Noll Decl. at ¶ 14; Dep. of Neil Gailmard ("Gailmard Dep.") at 68:17–69:23, Ex. 8 of Schechter Decl. re: Discriminatory Effect.

### 2. Interstate Optical Companies

Interstate optical chains, such as LensCrafters and ECCA, are the main competitors of dispensing optometrists in the sale of prescription eyewear. As plaintiffs point out, in 2001, interstate optical chains accounted for approximately 40 percent of optical retail sales nationwide. Noll Decl. at ¶ 16. A recent survey showed that in California, 26 percent of consumers made their last purchase of prescription eyewear from an interstate retail chain. Id. at ¶ 16; Ford Decl. at ¶ 10. Prior to the California Supreme Court's decision in Cole, explained in greater depth herein, interstate optical chains had been selling eyewear while also associating with specialized health care service plans licensed under the California Knox–Keene Health Care Service Plan Act of 1975, Cal. Health & Safety Code § 1340 et seq. See, e.g., Dep. of Wallace W. Lovejoy ("Lovejoy Dep.") at 23:16–22, Ex. 1 of Schechter Decl. re: Discriminatory Effect.

The Knox–Keene plans are a type of HMO. Under the supervision of a state agency, the Department of Managed Health Care ("DMHC"), Knox–Keene plans employ or contract with optometrists and provide optometric services to plan members. The interstate chains then lease space in their stores to Knox–Keene plans that employ the optometrists. Plaintiffs aver that, in this way, interstate chains had been able to provide one-stop shopping in competition with in-state dispensing optometrists and ophthalmologists, albeit with added regulatory and financial burdens.

These arrangements made pursuant to the Knox–Keene Act were recently invalidated by the California Supreme Court in the Cole case. At issue in the case was the Attorney General's contention that the co-location of an optical company, Pearle Vision, with an affiliated Knox–Keene plan that employs optometrists, violated two of the challenged restrictions, specifically Business & Professions Code sections 655 and 2556, and Code of Regulation section 1399.251. Under the Attorney General's interpretation, there was no circumstance under which an interstate entity could offer one-stop shopping consistent with the challenged restrictions.

In its recent opinion, the California Supreme Court concluded that the Act does not exempt approved plans from the restrictions imposed by sections 655 and 2556. People v. Cole, 38 Cal.4th 964, 969, 44 Cal.Rptr.3d 261, 135 P.3d 669 (2006). The court concluded that approved plans are authorized to deliver professional services, not to lease space. Id. at 986, 44 Cal.Rptr.3d 261, 135 P.3d 669. "As a landlord, Pearle RDO simply is not acting as a 'provider of professional services.'" Id. Without ruling on the question of whether or not the Pearle, Inc. business arrangement does in fact violate sections 655 and 2556, the court held that the Knox–Keene Act did not exempt optical companies from the restrictions set forth in sections 655 and 2556. The practical effect of the Cole decision is that optical companies may no longer compete in the California market through arrangements pursuant to the Knox–Keene Act.

### 3. Independent Opticians

Consumers may also purchase eyewear from independent licensed opticians. Cal.

Bus. & Prof.Code §§ 2550, 2553; Noll Decl. at ¶ 17. These independent optical shops sell eyewear, but do not affiliate with optometrists to make eye examinations available at the same location. Noll Decl. at ¶ 17. In 2001, independent opticians accounted for approximately 13.8 percent of retail sales nationwide. *Id.* A 2003 California survey showed only about 3.8 percent of consumers had made their last purchase of prescription eyewear from independent opticians. Ford Decl. at ¶ 12. These independent opticians are a declining part of the market. Noll Decl. at ¶ 27.

### 4. Dispensing Ophthalmologists

Finally, consumers may also purchase eyewear from ophthalmologists. In 2001, dispensing ophthalmologists accounted for approximately 12.3 percent of optical retail sales nationwide. Noll Decl. at ¶ 15.

### D. Consumer Demand for One–Stop Shopping

Plaintiffs present uncontroverted evidence demonstrating that the primary factor effecting competition in the retail eyewear market is the overwhelming consumer preference for one-stop shopping. One-stop shopping has "become the dominant form of retailing eyewear." Noll Decl. at ¶ 27. As the market figures relating to California independent opticians show, "stores that sell eyewear but do not offer [one-stop shopping] are increasingly marginal competitors in the market." Noll Decl. at ¶ 27; Ford Decl. at ¶ 12; Lovejoy Dep. at 246:24–247:2.

Defendants concede that offering one-stop shopping provides a competitive advantage because it is "easier to attract business, make sales, and enjoy profits." Defs.' Suppl. Resp. to ECCA First Set of Interrogs., No. 6, Ex. 11 of Schechter Decl. re: Discriminatory Effect.

Indeed, both defendants' and plaintiffs' experts state that consumers prefer the convenience of one-stop shopping and make their purchasing decisions accordingly. Ford Decl. at ¶¶ 15, 16; Dep. of Frank Baynham ("Baynham Dep.") at 116:21–117:5; 135:23–136:21, Ex. 12 of Schechter Decl. re: Discriminatory Effect; Lovejoy Dep. at 272:24–273:13; Defs.' Suppl. Resp. to ECCA First Set of Interrogs., No. 8, Ex. 11 of Schechter Decl. re: Discriminatory Effect. Consumers also find it more convenient to address any quality issues in one location, without concern for determining whether it was the optician or the optometrist that was responsible for the error. Noll Decl. ¶ 27. Defendants' expert, Dr. Thal, agrees. Thal Dep. I at 87:20–89:24, Ex. 6 of Schechter Decl. re: Discriminatory Effect (The ability to return to only one place to correct an error is "another benefit to the patient in being able to purchase their eyewear at the same place where they had their eyes examined.").

### E. Effect of the Challenged Restrictions on Ability of Interstate Optical Chains to Offer One–Stop Shopping

Section 655 prohibits an interstate optical company from leasing space in its eyewear store to an optometrist. Section 655 was introduced in the California Legislature in 1969 "on behalf of the California Optometric Association in an effort to protect California from some of the problems ... being experienced in eastern states, where large business interests have completely taken over the optometric profession." Letter from Senator Sherman, the legislation's chief sponsor, to Governor Reagan, dated August 11, 1969 ("Letter from Sen. Sherman to Gov. Reagan"), Ex. 13 of Schechter Decl. re: Discriminatory Effect; Dep. of Carolina Rose ("Rose Dep.") at 207:14–209:20, Ex. 14 of Schechter Decl. re: Discriminatory Effect; Defs.' Resp. to NAOO RFA No. 21, Ex. 18 of

Schechter Decl. re: Discriminatory Effect. In enacting Section 655, it was not the Legislature's "intention to harm any existing relationships between California optometrists" which were thus excluded "by a careful amendment." *See* Letter from Sen. Sherman to Gov. Reagan, Ex. 13 of Schechter Decl. re: Discriminatory Effect.

Section 2556 prohibits an interstate optical company from furnishing the services of an optometrist, or from maintaining an optometrist "on or near the premises used for optical dispensing ..." and from advertising that an optometrist is available where the eyewear is sold. Cal. Bus. & Prof.Code § 2556. Defendants' legislative analyst expert concedes that section 2556 was enacted as part of an effort to prevent out-of-state optical companies from coming into California and undercutting dispensing optometrists on price. Rose Dep. at 173:15–174:18. Section 1514 likewise prohibits an optical chain from occupying rented space with an optometrist. Sections 3130, 1514 and 1399.251 all prohibit optical chains from advertising the availability of one-stop shopping at their locations.

California law does not impose analogous restrictions on in-state dispensing optometrists or ophthalmologists; instead, it leaves them free to sell eyewear and to advertise one-stop shopping. *See, e.g.,* Cal. Bus. & Prof.Code § 2557.

## II.

### ANALYSIS[6]

#### A. The Dormant Commerce Clause

The Supreme Court has long interpreted the Commerce Clause to have a "negative aspect," referred to as the dormant Com-

merce Clause, "that denies the States the power unjustifiably to discriminate against or burden the interstate flow of articles of commerce." *Oregon Waste Sys., Inc. v. Dep't of Envtl. Quality,* 511 U.S. 93, 98, 114 S.Ct. 1345, 128 L.Ed.2d 13 (1994). The Court's dormant Commerce Clause jurisprudence is forged from the tension between the Constitution's twin commitments to national unity and local autonomy. *See Conservation Force, Inc. v. Manning,* 301 F.3d 985, 990 (9th Cir.2002); *see also H.P. Hood & Sons, Inc. v. Du Mond,* 336 U.S. 525, 533–34, 69 S.Ct. 657, 93 L.Ed. 865 (1949) (explaining that "[t]he desire of the Forefathers to federalize regulation of foreign and interstate commerce stands in sharp contrast to their jealous preservation of [states'] power over their internal affairs"). The Court has "struggled (to put it nicely) to develop a set of rules by which we may preserve a national market without needlessly intruding upon the States' police powers, each exercise of which no doubt has some effect on the commerce of the Nation." *Camps Newfound/Owatonna, Inc. v. Town of Harrison,* 520 U.S. 564, 596, 117 S.Ct. 1590, 137 L.Ed.2d 852 (1997) (Scalia, J., dissenting).

The instant motions demonstrate the difficulty of adjudicating between these tensions, pitting the State's power to regulate health professions relating to eye care against the federal interest in preserving a national market for eyewear that is free from protectionist barriers to competition. Given this difficulty, the Supreme Court has cautioned that the dormant Commerce Clause inquiry should be undertaken by "eschew[ing] formalism for a sensitive, case-by-case analysis of purposes and effects." *West Lynn Creamery, Inc. v. Hea-*

---

6. The standards applicable to resolution of a motion for summary judgment are well known, and have been discussed at length by this court elsewhere. *See, e.g., Guru Nanak Sikh Society v. County of Sutter,* 326

F.Supp.2d 1140, 1147 (E.D.Cal.2003). As a concession to both the shortness of life and the length of this opinion, the court will not repeat that discussion.

*ly,* 512 U.S. 186, 201, 114 S.Ct. 2205, 129 L.Ed.2d 157 (1994).

Nonetheless, in order to determine whether the regulations challenged in the case at bar implicate the dormant Commerce Clause, the court must engage in a two-part analysis. First, the court must determine if the challenged laws discriminate against interstate commerce. Second, "[w]here discrimination exists, the regulation is subject to strict scrutiny under which it is the state's burden to show that the discrimination is narrowly tailored to further a legitimate interest." *Conservation Force,* 301 F.3d at 995 (internal citations and quotation marks omitted). If there is no discrimination and "if the State regulates evenhandedly, the regulation is valid unless the plaintiff can show that it imposes a burden on interstate commerce clearly excessive in relation to the putative local benefits." *Id.*

The court first addresses the threshold question of whether the challenged regulations discriminate against interstate commerce.

**B.  Discriminatory Effect on Interstate Commerce**

"Discrimination" for purposes of the Commerce Clause means "differential treatment of in-state and out-of-state economic interests that benefits the former and burdens the latter." *Oregon Waste Sys.,* 511 U.S. at 99, 114 S.Ct. 1345. A state law may discriminate against interstate commerce in three ways, any one of which is sufficient to trigger strict scrutiny. A law may discriminate (1) on its face, by explicitly treating local and out-of-state interests differently; (2) in its purpose; (3) or in its effect, by providing a competitive advantage to local interests. *See SDDS, Inc. v. South Dakota,* 47 F.3d 263, 267 (8th Cir.1995).

Defendants contend that the dormant Commerce Clause is simply inappli-cable because the challenged restrictions do not effect interstate commerce. This is so, they argue, because the restrictions address purely local concerns and treat in-state and out-of-state entities in the same manner. While the latter issue is really just another way of framing the discrimination question, the former (whether the restrictions address purely local concerns) must be addressed as a threshold matter. Put simply, if the challenged restrictions have no impact on interstate commerce, the inquiry ends there.

**1.  Impact on Interstate Commerce**

**a.  The Lack of Facially Discrimina-tory Language**

Defendants' first argument in this regard may be easily dispensed with. They contend that the language of the challenged statutes and regulations makes no reference to interstate commerce or out-of-state companies. This contention while correct misses the point. "Certainly, a facially neutral statute may be discriminatory because of its effect." *Ford Motor Co. v. Texas Dep't of Transp.,* 264 F.3d 493, 500 (5th Cir.2001); *see Minnesota v. Clover Leaf Creamery Company,* 449 U.S. 456, 471 n. 15, 101 S.Ct. 715, 66 L.Ed.2d 659 (1981) ("A court may find a state law constitutes 'economic protectionism' on proof of either discriminatory effect, or of discriminatory purpose.").

While the language of a statute is certainly relevant to determining how that statute achieves effects in the real world, the absence of explicitly discriminatory language does not necessarily indicate an absence of discrimination. This is the essence of the concept of "discriminatory effects," which has been a feature of American constitutional law, not only in the Commerce Clause context; but in many other contexts since the landmark decision

in *Yick Wo v. Hopkins*, 118 U.S. 356, 6 S.Ct. 1064, 30 L.Ed. 220 (1886).

### b. Effect on Flow of Goods and Services

Defendants next argue that the challenged statutes and regulations are unrelated to the flow of goods and services and therefore have no effect on interstate commerce. Nothing about the challenged enactments, they argue, effects or prevents the passage of interstate goods or services either into or out of California; their subject matter is purely local activity.

The Supreme Court has addressed similar arguments and has held that "[e]ven when business activities are purely local, if 'it is interstate commerce that feels the pinch, it does not matter how local the operation which applies the squeeze.'" *Camps Newfound/Owatonna, Inc.*, 520 U.S. at 573, 117 S.Ct. 1590 (quoting *Heart of Atlanta Motel, Inc. v. United States*, 379 U.S. 241, 258, 85 S.Ct. 348, 13 L.Ed.2d 258 (1964)). Here, however, the activity being regulated—the operation of interstate chains within California—is clearly not purely local. Momentarily setting aside the question of whether the challenged restrictions are discriminatory or invalid, it is nevertheless clear that this is a classic "market entry" case.

It is well-established that regulations which "prevent competition in local markets by out-of-state firms" effect interstate commerce just as much as laws regulating the free flow of goods. *Lewis v. BT Inv. Managers*, 447 U.S. 27, 39, 100 S.Ct. 2009, 64 L.Ed.2d 702 (1980) (striking down statute which discriminated against out-of-state entities' ownership of local investment or trust businesses).

For instance, in *C & A Carbone, Inc. v. Clarkstown*, 511 U.S. 383, 391–92, 114 S.Ct. 1677, 128 L.Ed.2d 399 (1994), the Supreme Court found that a local ordinance requiring all solid waste to be processed at a pre-designated local facility effected interstate commerce. *Carbone*, 511 U.S. at 389, 114 S.Ct. 1677. The Court explained that "the article of commerce is not so much the solid waste itself, but rather the service of processing and disposing of it." *Id.* at 391, 114 S.Ct. 1677. "The essential vice in laws of this sort is that they bar the import of the processing service" and "leave[ ] no room for investment from outside." *Id.* at 392, 114 S.Ct. 1677. Consequently, the dormant Commerce Clause was implicated because the ordinance restricted the flow of services, and "deprive[d] out-of-state businesses of access to a local market." *Id.* at 389, 114 S.Ct. 1677; *see also Camps Newfound/Owatonna*, 520 U.S. at 577 n. 10, 117 S.Ct. 1590 ("We have long noted the applicability of our dormant Commerce Clause jurisprudence to service industries."); *Gulch Gaming, Inc. v. South Dakota*, 781 F.Supp. 621, 625 (D.S.D.1991) (finding that statute which "interferes with the flow of investments across state lines ... [and thus] restricts the opportunities of nonresidents ... to invest ... in businesses owning South Dakota gaming licenses" effects interstate commerce); *John Havlir & Assoc., Inc. v. Tacoa, Inc.*, 810 F.Supp. 752, 756 (N.D.Tx.1993) ("Statutes that impose burdens on out-of-state businesses that are not applicable to in-state businesses effect interstate commerce just as directly as those that regulate the flow of goods across state lines.").

Similarly, and for the reasons discussed herein, the relevant regulated activity in this case is not so much the flow of eyewear itself, as it is the service of selling prescription eyewear.

### c. Professional Regulations & Commerce Clause

Defendants appear to contend that state regulation of the learned professions is

necessarily purely local, or insulated in some way from Commerce Clause challenge. I cannot agree.

In *National Pharmacies, Inc. v. De Melecio,* 51 F.Supp.2d 45 (D.P.R.1999), a dormant Commerce Clause challenge to Puerto Rico's restrictions on the practice of pharmacy, the court rejected a nearly identical argument by the government that the "practice of pharmacy is a profession, not a part of commerce, and Puerto Rico's regulation of pharmacists is therefore not subject to the strictures of the dormant commerce clause." *Id.* at 54. The conclusion reached by the *National Pharmacies* court—that there is no such exception for the profession—is just as applicable here.

■ It is true that the states have broad powers to regulate and license the practice of the professions, *Goldfarb v. Virginia State Bar,* 421 U.S. 773, 792, 95 S.Ct. 2004, 44 L.Ed.2d 572 (1975); *Goldfarb v. Supreme Court of Virginia,* 766 F.2d 859, 862 (4th Cir.1985), and that the states' police powers indisputably provide authority for legislation which protects the health and safety of their citizens. *See Maine v. Taylor,* 477 U.S. 131, 151–52, 106 S.Ct. 2440, 91 L.Ed.2d 110 (1986); *Ferndale Laboratories v. Cavendish,* 79 F.3d 488, 495 (6th Cir.1996). It does not follow that the state is free from Commerce Clause concerns. On the contrary, when a state legislates in an area of legitimate local concern, it nevertheless is limited by the Commerce Clause. *Minnesota v. Clover Leaf Creamery Co.,* 449 U.S. 456, 471, 101 S.Ct. 715, 66 L.Ed.2d 659 (1981). This limitation applies even for state regulations regarding the health of its citizens. *See Kassel v. Consol. Freightways,* 450 U.S. 662, 670, 101 S.Ct. 1309, 67 L.Ed.2d 580 (1981) ("The incantation of a purpose to promote the public health or safety does not insulate a state law from Commerce Clause attack. Regulations designed for that salutary purpose nevertheless may further

the purpose so marginally, and interfere with commerce so substantially, as to be invalid under the Commerce Clause."); *Hunt v. Washington State Apple Adver. Comm'n,* 432 U.S. 333, 350, 97 S.Ct. 2434, 53 L.Ed.2d 383 (1977) ("[a] finding that state legislation furthers matters of legitimate local concern, even in the health and consumer protection areas, does not end the inquiry.").

That proposition applies with equal force in the case of state laws that regulate professions. Courts have considered whether state laws that regulate professions unconstitutionally limit interstate commerce on numerous occasions, making clear that there is no "professional regulation" exception to the Constitution's dormant Commerce Clause requirements. *See, e.g., Head v. New Mexico Bd. of Exam'rs in Optometry,* 374 U.S. 424, 428–29, 83 S.Ct. 1759, 10 L.Ed.2d 983 (1963) (law prohibiting optometrists from mentioning specific prices in their advertising); *Tolchin v. Sup.Ct. of State of New Jersey,* 111 F.3d 1099, 1106–11 (3rd Cir.1997) (requirements for the practice of law in state); *Kirkpatrick v. Shaw,* 70 F.3d 100, 103 (11th Cir.1995) (rules for lawyers' admission to state bar); *Tetra Technologies, Inc. v. Harter,* 823 F.Supp. 1116, 1121–24 (S.D.N.Y.1993) (law on licensing engineers); *Ferndale,* 79 F.3d at 492–96 (regulation of wholesale distributors of pharmaceuticals); *K–S Pharmacies v. American Home Products,* 962 F.2d 728, 730–32 (7th Cir.1992) (statute forbidding price discrimination in wholesale transactions of prescription drugs).

Analogously, in the Sherman Act antitrust context, the professions are considered a part of interstate commerce. *See Summit Health, Ltd. v. Pinhas,* 500 U.S. 322, 329–33, 111 S.Ct. 1842, 114 L.Ed.2d 366 (1991) (allegation that hospitals conspired to exclude a single physician from

the market for ophthalmological services in Los Angeles was sufficient to establish a nexus to interstate commerce for purposes of antitrust jurisdiction); *Goldfarb*, 421 U.S. at 786–88, 95 S.Ct. 2004 (in case involving a minimum legal fee schedule established by bar association, Court rejected argument that the learned professions were not a part of trade or interstate commerce); *Boddicker v. Arizona State Dental Ass'n*, 549 F.2d 626, 629–32 (9th Cir.1977) (dental associations' membership requirements on individual dentists effected interstate commerce and these practices were not entitled to a "learned profession" exemption).

Because the challenged regulations implicate, and indeed effect, interstate commerce, the next step of the analysis is determining whether the regulations discriminate against interstate commerce.

## 2. Discriminatory Effect

### a. Whether the Relevant In–State and Out–of–State Entities Are Similarly Situated

In dormant Commerce Clause analysis, " 'discrimination' simply means differential treatment of in-state and out-of-state economic interests that benefit the former and burden the latter." *Oregon Waste Systems*, 511 U.S. at 99, 114 S.Ct. 1345.

The evidence proffered by the plaintiffs, and much of the defendants' evidence as well, demonstrates that in-state optometrists and ophthalmologists who sell eyewear compete with interstate optical chains to sell the same product—prescription eyewear—to the same customers in the same retail eyewear market. Defendants' own experts, for instance, testified that a dispensing optometrists' "biggest single competitor [is] a retail chain." Dep. of Joseph Bruneni ("Bruneni Dep.") at 75:16–24, Ex. 10 of Schechter Decl. re: Discriminatory Effect. Moreover, consumers can and do switch between dispensing optometrists and optical chains to purchase their prescription eyewear in a market where the competition between them is "plentiful." Thal Dep. II at 272:21–274:1, Ex. 7 of Schechter Decl. re: Discriminatory Effect.

Plaintiffs argue that the challenged restrictions treat these competing entities differently, favoring the former (in-state entities), and burdening the latter (out-of-state entities). Thus, they contend, California has conferred upon in-state competitors a monopoly over selling prescription eyewear at the same location where an eye exam is given—"one-stop shopping"—a service that consumers demonstrably prefer.

In response, defendants argue that plaintiffs cannot show discrimination because the relevant entities—out-of-state optical chains and in-state optometrists and ophthalmologists who sell eyewear are not "similarly situated." Defendants argue that plaintiffs, who are optical companies, are not similarly situated to California optometrists or ophthamologists, because, one, "optical companies are business entities, while optometrists and opthamologists are highly educated, trained, and licensed health care professionals, [and two], optical companies and optometrists/opthamologists are also not similarly situated as retail eyewear competitors, as each provides distinct services to different consumer bases." Def's Opp'n. at 8–9.

The first of these arguments can be referred to as defendants' formal argument; it contends that the relevant entities are not similarly situated because the entities are of a different form or type from one another. The second argument is a functional argument; it contends that the two entities are not similarly situated because they function differently in the marketplace, providing different services to different customers.

Both of these arguments rely heavily on two Supreme Court cases; it is therefore worth briefly revisiting these cases in light of defendants' arguments before proceeding.

### i. *Exxon Corporation v. Governor of Maryland*

In *Exxon Corp. v. Governor of Maryland*, 437 U.S. 117, 98 S.Ct. 2207, 57 L.Ed.2d 91(1978), the Supreme Court addressed a statute which flatly prohibited producers and refiners of petroleum products from opening or operating retail services within Maryland under a variety of corporate or contractual arrangements. *Id.* at 120, n. 1, 98 S.Ct. 2207. The law was enacted in response to perceived inequities in the allocation of petroleum products to retail outlets during the fuel shortage of 1973. Various oil companies, all of whom engaged in production and refining as well as in sale of petroleum products, challenged the statute on a number of grounds. They claimed, inter alia, that the statute violated the Commerce Clause because it discriminated against producers and refiners, all of whom were interstate concerns, in favor of independent retailers, most of which were local businesses.

The *Exxon* Court rejected this contention. After holding that the statute served the legitimate state purpose of "controlling the gasoline retail market," *Id.* at 125, 98 S.Ct. 2207, the Court separately analyzed its effect on interstate commerce in the producing-refining and retailing ends of the petroleum industry. The Court concluded that the statute could not discriminate against interstate petroleum producers and refiners in favor of locally based competitors because, as a matter of fact, there were no such local producers or refiners to be favored. *Id.* For the same reason, it concluded that the flow of petroleum products in interstate commerce would not be reduced. *Id.* at 127, 98 S.Ct. 2207.

The Court also rejected a claim of discrimination at the retail level because the statute placed "no barriers whatsoever" on competition in local markets by "interstate independent dealers" that did not own production or refining facilities. *Id.* at 126, 98 S.Ct. 2207. Despite the fact that the number of stations operated by independent dealers was small relative to the number operated by producer-refiners, the Court concluded that neither the placing of a disparate burden on some interstate competitors nor the shifting of business from one part of the interstate market to another was enough, under the circumstances, to establish a Commerce Clause violation. *Id.* at 126–127, 98 S.Ct. 2207.

*Exxon* is clearly distinguishable. Unlike *Exxon*, in the instant case, California has enacted a statutory scheme which has the practical effect of barring all out-of-state entities from offering one-stop shopping, while reserving for the principal in-state competitors the right to provide this competitive advantage.

In *Exxon*, the Court found that interstate dealers were able to compete in the same manner as in-state service station owners under the Maryland law. Only gasoline refiners could no longer compete in the Maryland retail market. Unlike the case at bar, in *Exxon*, other interstate firms could compete in the Maryland market. Under these circumstances, the Court held, the dormant Commerce Clause was not violated. As the Court explained, "the [dormant Commerce] Clause protects the interstate market, not particular interstate firms, from prohibitive or burdensome regulations." *Id.* at 127–28, 98 S.Ct. 2207.

This holding cannot be extended to the challenged regulations in the case at bar. Here, the challenged regulations prohibit all interstate firms from competing with in state optometrists on the same terms.

Unlike the facts in *Exxon*, there are no inter-state companies that can compete with the in-state entities.

### ii. *General Motors v. Tracy*

In *General Motors Corporation v. Tracy*, 519 U.S. 278, 117 S.Ct. 811, 136 L.Ed.2d 761 (1997), the Court considered an Ohio statute which imposed a general sales and use tax on natural gas purchases from all sellers, whether in-state or out-of-state, except regulated public entities that met Ohio's statutory definition of a "natural gas company." A "natural gas company" was defined as any person "engaged in the business of supplying natural gas for lighting, power, or heating purposes to consumers within this state." *Id.* at 281, 117 S.Ct. 811. While the term applied to natural gas utilities (termed "local distribution companies" or LDC's) located within Ohio, Ohio's state supreme court had interpreted the statutory term to exclude non-LDC gas sellers, such as producers and independent marketers. The Supreme Court granted certiorari to decide whether the difference in tax treatment between sales of gas by other entities violated the Commerce Clause.

The Court found that there was no Commerce Clause violation because the favored and disfavored entities were not similarly situated. As the Court explained:

> Conceptually, of course, any notion of discrimination assumes a comparison of substantially similar entities. Although this central assumption has more often than not itself remained dormant in this Court's opinions on state discrimination subject to review under the dormant Commerce Clause, when the allegedly competing entities provide different products, as here, there is a threshold question whether the companies are indeed similarly situated for constitutional purposes. This is so for the simple reason that the difference in products may mean that the different entities serve different markets, and would continue to do so even if the supposedly discriminatory burden were removed.

*Id.* at 298, 117 S.Ct. 811.

Significantly for present purposes, this conclusion was not based on a determination that the two natural gas sellers were not of the same type and were not similarly situated. As the Court explained, "in the absence of actual or prospective competition between the supposedly favored and disfavored entities in a single market there can be no local preference, whether by express discrimination against interstate commerce or undue burden upon it, to which the dormant Commerce Clause may apply." *Id.* at 300, 117 S.Ct. 811. In short, the Court appeared to focus on competition and the market served.[7]

### b. Defendants' "Formal" Argument

The court first addresses defendants' formal argument, i.e., the contention that there is no discrimination because the relevant entities are of different types and thus cannot be compared.

The Sixth Circuit recently addressed the same issue in *LensCrafters, Inc. v. Robinson*, 403 F.3d 798, 802 (6th Cir.2005).[8] There, the Sixth Circuit found that a Tennessee statute which prohibited interstate eyewear retailers from leasing space in

---

7. *See also Camps Newfound/Owatonna, Inc. v. Town of Harrison*, 520 U.S. 564, 582 n. 16, 117 S.Ct. 1590, 137 L.Ed.2d 852 (1997) (observing that the *Tracy* "Court premised its holding ... on the view that sellers of 'bundled' and 'unbundled' natural gas were principally competing in different markets.").

8. This decision was issued after the briefing in the pending motions was complete. Although the parties did not address the Sixth Circuit's decision in their papers, the case was discussed at length at oral argument.

their stores to optometrists was not discriminatory in purpose or effect and therefore, did not violate the dormant Commerce Clause.

In reviewing the discriminatory effect of the statute, the Sixth Circuit held that:

> [L]icensed optometrists and optometric stores such as LensCrafters are not similarly situated because they provide different services to the market. Unlike retail optical stores, licensed optometrists are healthcare providers and, as such, have unique responsibilities and obligations to their patients that are not shared by optometric stores.

*LensCrafters,* 403 F.3d 798, 804 (6th Cir. 2005).

With the greatest of respect, I cannot agree with the Sixth Circuit's reasoning. As this court reads the dormant Commerce Clause cases, the question is not whether the entities are business corporations versus educated professionals, but whether they "provide different products" because a "difference in products may mean that the different entities serve different markets, and would continue to do so even if the supposedly discriminatory burden were removed." *Tracy,* 519 U.S. at 298, 117 S.Ct. 811.

■ In conducting the "similarly situated" inquiry, courts have consistently considered whether entities engage in competition rather than whether the entities are of different types. Indeed, in instances where laws do not facially discriminate against interstate commerce but a discriminatory effect is claimed, it will not be uncommon that the relevant entities are, at least to some extent, of different types. Thus the question is not whether the entities are different, but whether they are in competition. *See, e.g., Continental Illinois Corp. v. Lewis,* 827 F.2d 1517 (11th Cir. 1987) (examining not the status of the entities, but analyzing whether the favored and disfavored entities were both compet-ing for the same market); *Globe Glass & Mirror Co. v. Brown,* 917 F.Supp. 447 (E.D.La.1996) (noting that the fact that favored in-state entity and disfavored out-of-state entity had different "statuses" is irrelevant); *Bacchus Imports, Ltd. v. Dias,* 468 U.S. 263, 104 S.Ct. 3049, 82 L.Ed.2d 200 (1984) ("As long as there is some competition between the locally produced exempt products and non-exempt products from outside the State, there is discriminatory effect.").

Put directly, it appears to this court that it is the activity or conduct engaged in that is compared, without regard to the status of the entity. In other words, to figure out who the similarly situated entities are, the court looks at whether or not the favored and disfavored entities compete in the same market, with the same products, for the same customers.

As previously noted, the evidence in this case is overwhelming that interstate optical companies, such as Lenscrafters, and in-state optometrists compete for the same customers with the same products in the same market. As defendants' own expert explained, "the guts of dispensing eyewear in a medical office or in an optometric office, or in a retail chain, they're basically the same." Bruneni Dep. at 23:8–19, Ex. 10 of Schechter Decl. re: Discriminatory Effect. Indeed, it is undisputed that dispensing optometrists and optical chains compete for the exact same consumers. As defendants concede, consumers readily switch between optometrists and retail optical chains for their prescription eyewear purchases. *See* Defs.' Resp. to NAOO RFA No. 21, Ex. 18 of Schechter Decl. re: Discriminatory Effect; Defs.'s Suppl. Resp. to ECCA First Set of Interrogs., No. 5, Ex. 11 of Schechter Decl. Dr. Thal, defendants' expert, characterized the competition as "plentiful." Thal Dep. Vol. II at 272:21–274:1; 330:2–13, Ex. 6 of

Schechter Decl. Mr. Bruneni, another defense expert, testified that a dispensing optometrists' "biggest single competitor [is] a retail chain." Bruneni Dep. at 40:16–41:9; 61:14–62:3; 65:5–17; 75:16–24, Ex. 10 of Schechter Decl.

### c. Defendants' "Functional" Argument

Defendants' functional argument proceeds from the correct premise, as outlined above, that the proper inquiry is how the relevant entities compete in the market. Defendants argue that the entities are not similarly situated because the optometrists and opthamologists provide services—health services—that optical chains like Lenscrafters do not, and that they have special training that staff at Lenscrafters do not. Hence, defendants argue, they are competing for different customers and in a different market.

The first problem with defendants' argument is that they have produced no evidence to demonstrate that the entities are really competing for different customers with respect to eyewear sales, and, as discussed above, the evidence in fact contradicts that contention quite squarely.

The second problem, however, is a conceptual one. The conduct at issue in this litigation is the retail selling of prescription eyewear, and for that activity, the special training of optometrists and ophthalmologists is irrelevant. If the selling of eyewear had a component that was health related, then all optometrists would be required to sell glasses and no optical companies or opticians would be permitted to do so. That, however, is simply not the case.

Optometrists who sell eyewear wear two hats—one as a provider of health care services and another as a retail seller of eyewear. When wearing the hat of the retailer, an optometrist is in direct competition with optical companies such as plain-

tiffs. For these reasons, the court concludes that optometrists who sell eyewear are similarly situated to out-of-state optician companies for constitutional purposes. *Tracy*, 519 U.S. at 298, 117 S.Ct. 811.

### 3. Relevance of Purpose Evidence

Finally, although plaintiffs do not advance a purpose-based argument in their briefs, they have presented evidence suggesting that some of the provisions challenged in this litigation were enacted with a purely protectionist purpose. Specifically, the evidence shows that Section 655, arguably the key provision being challenged, was introduced in the California Legislature, as the Act's chief sponsor put it, "on behalf of the California Optometric Association in an effort to protect California from some of the problems ... being experienced in eastern states, where large business interests have completely taken over the optometric profession." Letter from Sen. Sherman to Gov. Reagan, Ex. 13 of Schechter Decl. re: Discriminatory Effect. This evidence is quite strong. *See S. Dakota Farm Bureau v. Hazeltine*, 340 F.3d 583, 593 (2003) ("the most obvious" evidence of discriminatory purpose "would be direct evidence that the drafters ... intended to discriminate against out-of-state businesses.").

While this evidence does not shed further light on how the challenged restrictions operate in practice, it does buttress the conclusion that the regulatory scheme is in fact an instance of economic protectionism. "Discriminatory purpose is at the heart of dormant Commerce Clause analysis and is often incorporated into both first-tier analysis and second-tier Pike balancing analysis." *S. Dakota Farm Bureau*, 340 F.3d at 596; *see also Fulton Corp. v. Faulkner*, 516 U.S. 325, 330, 116 S.Ct. 848, 133 L.Ed.2d 796 (1996) (describing dormant Commerce Clause as a prohi-

bition on state regulations designed with the purpose of benefiting in-state interests by burdening out-of-state interests); *West Lynn Creamery,* 512 U.S. at 196, 114 S.Ct. 2205 (noting purpose of state's unconstitutional pricing scheme although resting decision on statute's discriminatory effect); *Taylor,* 477 U.S. at 148, 106 S.Ct. 2440 (equating purposeful economic protectionism with per se invalidity); Donald H. Regan, *The Supreme Court and State Protectionism: Making Sense of the Dormant Commerce Clause,* 84 Mich. L Rev. 1091, 1206–1233 (1986) (presenting and defending thesis that Supreme Court's dormant Commerce Clause analysis is driven by desire to prevent purposeful protectionism).

## C. Non–Discriminatory Alternatives

Given the court's conclusion that the challenged laws have a discriminatory effect on interstate commerce, "the regulation is subject to strict scrutiny under which it is the state's burden to show that the discrimination is narrowly tailored to further a legitimate interest." *Conservation Force, Inc.,* 301 F.3d at 995.

If a law discriminates against interstate commerce, it is "virtually per se invalid," *Oregon Waste Systems, Inc.,* 511 U.S. at 99, 114 S.Ct. 1345, unless "the municipality can demonstrate, under rigorous scrutiny, that it has no other means to advance a legitimate local interest." *Carbone,* 511 U.S. at 391, 114 S.Ct. 1677; *see also Hughes v. Oklahoma,* 441 U.S. 322, 337–338, 99 S.Ct. 1727, 60 L.Ed.2d 250 (1979)(explaining the state's burden to show, under "the strictest scrutiny," that the regulation is the "least discriminatory alternative" to advance a legitimate purpose); *Camps Newfound/Owatonna,* 520 U.S. at 582, 117 S.Ct. 1590 (observing that discrimination against interstate commerce invokes the "strictest scrutiny" which "is an extremely difficult burden").

To date, the Supreme Court has upheld discriminatory laws only where the discrimination was justified by the threat of death or disease. *See e.g., Maine v. Taylor,* 477 U.S. 131, 106 S.Ct. 2440, 91 L.Ed.2d 110 (1986) (upholding Maine's prohibition on importing live baitfish because of the potential for destruction of Maine's fisheries); *Clason v. Indiana,* 306 U.S. 439, 59 S.Ct. 609, 83 L.Ed. 858 (1939) (upholding Indiana's restrictions on transporting dead animals without a license because of the potential for disease).

To survive summary judgment, defendants must demonstrate issues of fact regarding whether the laws are justified by a valid factor unrelated to economic protectionism and, if so, that no neutral alternatives are available. *Envtl. Tech. Council v. Sierra Club,* 98 F.3d 774, 786 (4th Cir. 1996); *see also S. Dakota Farm Bureau, Inc.,* 340 F.3d at 597 (explaining that defendant has high burden of demonstrating ineffectiveness of potential alternatives); *Johnson, MacDonald & Associates v. Webster Plastics,* 856 F.Supp. 1249, 1253 (S.D.Ohio 1994)("Under the strict scrutiny test, it is the defender of the statute which must come forward with proof there is no non-discriminatory alternative.").

### 1. Legitimate Local Purpose

The court first considers whether defendants have set forth legitimate interests for the challenged regulations. Although the Supreme Court has adopted a broad construction of the applicability of the dormant Commerce Clause, it has cautioned that "[t]he Commerce Clause ... does not elevate free trade above all other values." *Maine,* 477 U.S. at 151, 106 S.Ct. 2440. That said, states have broad powers to regulate in the interests of their citizens.

Here, defendants assert that the challenged laws were designed to protect against corporate influence interfering

**1132**

with optometrists' professional judgment. Alvin Korobkin Dep., Ex. TT in support of Defs.' Mot for Summ. J. and in Opp'n to Pls.'s Mots. for Summ. J. ("Defs.' Ex."). Defendants maintain that "patient care and privacy are being compromised when lay optical companies control optometrists." Defs.' Opp'n at 26.

It is well established that a state has the right to impose regulations in the interest of local health and safety. *See Maine,* 477 U.S. at 131, 106 S.Ct. 2440; *H.P. Hood and Sons,* 336 U.S. at 535, 69 S.Ct. 657 ("This court consistently has rebuffed attempts of states to advance their own commercial interests by curtailing the movement of articles of commerce, either into or out of the state, while generally supporting their right to impose even burdensome regulations in the interest of local health and safety.").

As explained below, even assuming that defendants have a legitimate interest in protecting public health through the challenged regulations, defendants fail to establish that there exist no non-discriminatory alternative measures to address this exact interest.

**2. Non–Discriminatory Alternatives**

The court assumes for the purpose of this analysis that corporate domination of eye professionals presents a real danger. Defendants contend that "no less discriminatory alternative measures exist which would effectively protect the public from the evils that occur when lay corporations control health care professionals." Defs.' Opp'n at 24. They maintain that the challenged laws are the only means by which to insure that the public receive non-biased eye care and that neither neutral laws or a scheme akin to the Knox–Keene plan would be effective at preventing the evils which plague optometrists who work for corporate stores. Defendants maintain that the "only way to combat the problem

is to free all optometrists from that lay control by separating them from lay optical companies, as [the challenged statutes] do." Defs.' Opp'n at 22.

In opposing plaintiffs' motion for summary judgment, defendants implicitly argue that there remains an issue of material fact which defeats summary judgment, namely, whether the public receives a lower level of care from optometrists affiliated with chains as compared to dispensing optometrists. In support of this contention, defendants present literally hundreds of pages of evidence which suggests that the quality of service provided by corporately managed optometrists is poor. Nonetheless, for the reasons explained herein, defendants fail to tender sufficient facts so as to defeat plaintiffs' motion for summary judgment.

**a. Defendants' Evidence Regarding the Quality of Care Provided by Optometrists Associated with Chains such as LensCrafters.**

Defendants present evidence of the various problems which arise when optometrists are employed by companies such as Lenscrafters. This evidence generally suggests that Lenscrafters exerts pressure on optometrists who work within LensCrafter stores. For example, limitations are placed upon the optometrists so that they prescribe LensCrafters' proprietary optical goods, and optometrists are evaluated based upon the percentage of their eye exam patients who purchase Lenscrafters' eyewear. *See* Kim Lee Dep., Defs.' Ex. NN. Similarly, Lenscrafters pressures its optometrists to perform a certain numbers of dilation or retinal photographs regardless of need. *Id.* Even if the court were to accept defendants' recitation of all the evidence they present, there are two general problems which defeat their opposition to plaintiffs' motions.

First, plaintiffs present uncontroverted evidence that the same practices which defendants complain of occur in the dispensing optometrists setting as well. In other words, the setting (optometrists affiliated with chains versus dispensing optometrists) makes no difference as to practices—the same practices occur in both settings. With one exception, (which is discussed below), defendants fail to present any evidence which compares the quality of care between dispensing optometrists and optometrists who work for optical chains.

Not knowing if the quality of service varies between practice setting is an important issue in this case. As mentioned earlier, defendants central argument is that "the only way to combat the problem [of corporate control] is to free all optometrists from that lay control by separating them from lay optical companies as [the challenged restrictions do]." Defs.' Opp'n at 22. However, as plaintiffs argue, in order to accept this argument, the court would have to find that optometrists provide worse care when affiliated with a chain than when acting as a dispensing optometrist. The court cannot make that finding. It is not enough to prove that optometrists in general provide shoddy service. In this regard, defendants simply fail to show that the quality of care is comparatively worse or better depending on the practice setting. Plaintiffs, meanwhile, set forth sufficient facts which reveal that the same problem practices which defendants allege are prevalent in the corporate setting, are just as prevalent when optometrists dispense eyewear.

The court reviews some of the facts relied on by both parties to illustrate this point. First, defendants contend that optometrists who co-locate with a chain are required to prescribe LensCrafters optical goods. Defs.'s Opp'n at 8, 9–10. Defendants suggest that "[f]or some patients,

use of a substitute LensCrafters' product could adversely affect a patient's vision." *Id.* at 9:15–16.

Plaintiffs maintain that the same practice occurs with dispensing optometrists. This is regarded as an "important benefit" to private optometrists. Bruneni Dep. at 72:21–73:4, 74:18–21, Ex. 4 of Suppl. Moynihan Decl. Indeed, there are proprietary brands (such as the Varilux brand) which are sold only by private optometrists. *Id.* at 80:16–22. Dr. Neil Gailmard, plaintiffs' expert, explained that in private practices, some dispensing optometrists write prescriptions in such a way as to make it difficult for patients to have them filled other than at that optometrist's dispensary. Gailmard Dep. at 91:1–9, Ex. 8 of Suppl. Moynihan Decl.

Second, defendants contend that co-located practices can include incentives and bonus systems which create a conflict of interest for the optometrist as a health professional. Again, plaintiffs point to evidence which suggests that the same incentive schemes operate in offices of dispensing optometrists as well. Plaintiffs rely on evidence which demonstrates that compensation for dispensing optometrists is based directly on the number of eye exams provided, the sale of eyewear and the sale of premium brands. Thal Dep. II at 339:15–340:14, Ex. 22 of Suppl. Moynihan Decl.; Bruneni Dep. at 125:24–126:2, Ex. 4 of Suppl. Moynihan Decl. ("If the private optometrist quits selling premium lenses, he would quit driving his Mercedes.").

In fact, dispensing optometrists traditionally seek to increase revenues in their dispensaries by paying their employees, including associate optometrists, bonuses or commissions based on the sales of certain products. Gailmard Dep. at 101:9–103:23, Ex. 8 of Suppl. Moynihan Decl. (describing methods used by dispensing optometrists to motivate employees, including optometrists, to sell more, for ex-

ample, commissions, bonuses and other incentives); Dep. of Annette Juneau ("Juneau Dep.") at 80:3–81:12, Ex. 11 of Suppl. Moynihan Decl. (nationally recognized practice management consultant testified that "spiffs"—paying bonuses based on sales of particular frames or add-ons—are a typical and traditional manner of compensating optical employees in a dispensing optometrist's practice).

Associate optometrists employed by other dispensing optometrists also are given financial incentives to prescribe certain products, write more prescriptions and see more patients. Dep. of Bradley Williams ("Williams Dep.") at 69:24–70:13, 85:5–87:9, Ex. 26 of Suppl. Moynihan Decl. (Practice management consultant with California clients testified that it is quite typical for an associate optometrist, employed by another optometrist, to receive a productivity bonus or compensation component to motivate him to see more patients and build the business); Juneau Dep. at 109:15–110:1 (explaining that associate optometrists are often compensated by their employer optometrists based upon a percentage of professional fees and optical revenue produced, typically 20%).

Third, defendants tender evidence of Lenscrafter employees "transitioning the patients" from the optometrists' exam area to the optical sales area. Defs.' Opp'n at 11:21; Lee Dep. at 131, Defs.' Ex. NN; Papadakis Dep. at 133–134, Defs.' Ex. RR. Again, defendants suggest that this practice may not be in the best interest of the patient's health. Plaintiffs, however, present evidence that "transitioning" is a common part of private optometry practice, known as part of the "circular flow" practice management model. Gailmard Dep. at 94:3–95:21, Ex. 8 of Suppl. Moynihan Decl; Alan Limfat Dep. at 87:10–24, 89:12–90:5, Ex. 12 of Suppl. Moynihan Decl. Practice management consultants teach the practice as a method of retaining opto-

metric patients as dispensing customers. Gailmard Dep. at 126:6–127:9, 127:16–129:9, Ex. 8. of Suppl. Moynihan Decl. Thus, dispensing optometrists are taught to rely on their relationship of trust and position of authority with their patients to sell more eyewear.

Fourth, defendants present evidence that optometrists affiliated with chains perform "quick" eye exams. Defs.' Opp'n 10; Thal declaration, para. 7–10; "Sweet Lemons" article, Defs.' Ex. II. However, defendants fail to establish that this amount of time is not comparable to the amount of time spent by dispensing optometrists. Indeed, plaintiffs point to evidence which shows that optometrists in private practice settings may spend the same or less time on eye exams. Gailmard Dep. at 142:20–24, Ex. 8 of Suppl. Moynihan Decl. (optometrist can perform a complete eye exam in 15 minutes); *id.* at 118:21–119:18 (scheduling 15 minute eye exam slots is not too fast to deliver patient care of the absolute highest quality); Bradley Williams Dep. at 188:25–191:12, Ex. 26 of Suppl. Moynihan Decl. (it is "nonsense" to say that an eye exam cannot be accomplished in less than 20 minutes of optometrist time); Elliott Shapiro Dep. at 76:24–77:5, Ex. 20 of Suppl. Moynihan Decl. (time spent and number of patients seen while in private practice was "virtually identical" to his practice at EYEXAM).

Plaintiffs also point to evidence presented by defendants that similar complaints are raised against dispensing optometrists and optometrists in chain stores. *See, e.g.*, Report of Patient Abuse, Defs.'s Ex. FF–17 (LH 1217–3237) ("this situation could have occurred with any other optometrist and has"); *id.* at LH 1217–3240 (complaint regarding practice owned and operated by optometrists); *id.* at LH 1217–3247 (complaining about "multiple office practices, even when owned by an optometrist"); *id.* at LH 1217–3252 ("doctors of optometry

who own multi-branch offices are more concerned with being businessmen rather than with being eye health practitioners"); *id.* at LH 1217–3255 (complaints regarding "doctor who owned the practice"); *id.* at LH 1217–3257 (complaint regarding optometric practice "owned and administered by licensed optometrists"); *id.* at LH 1217–3258 (complaining about a practice "run by an optometrist whose primary goal would appear to be solely monetary.").

There is, however, some evidence presented by the defendants that deserves closer examination. Defendants rely on the declaration of Phillip Parker, a professor of economics and international strategy. Attached to his declaration are two reports. The first report is entitled, "The Detection of Selected Eye Conditions: A Study of Quality Differences Between Commercial and Private Optometrists in the Boroughs of Brooklyn, Manhattan and Queens." It is dated 1985. This study purports to show that optometrists affiliated with chain stores provide quick and less thorough eye examinations than their independent counterparts. *See* Ophthalmic Practice Rulemaking Statement, Robert R. Nathan Associates, Inc., Defs.' Ex. FF–21. The second report focuses exclusively on optometry in California and seeks to compare the two settings of optometry. Defs.' Ex. HH. Based on these reports, Parker concludes that there is a difference in quality between dispensing optometrists and optometrists who work for chains.

It appears to the court that the reports cannot be relied upon for several reasons.

First, the reports were written by self-labeled "consulting economists," not optometrists. *See* Defs.' Ex. FF–21 at LH 1217–4193. Accordingly, neither Parker (an economist) nor the other authors of the reports can assess the quality of care patients receive. Second, Parker's conclusions, as well as the conclusions in the reports, are based almost exclusively on the amount of time that an optometrist spends with a patient. Parker concludes that less time equates to a lower quality of care. *See* Defs.' Ex. HH. Yet, Parker presents no evidence that this is in fact the case. Most importantly, plaintiffs tender sufficient undisputed facts which show that less time does not necessarily equate to a lower quality of care. *See, e.g.,* Julie Ann Wagstaff Dep. at 28:9–23, 85:25–87:7, 143:25–146:2, Ex. 25 of Suppl. Moynihan Decl.; Galimard Dep. at 142:20–24, 118:21–119:18, Ex. 8 of of Suppl. Moynihan Decl.; Williams Dep. at 188:25–191:12, Ex. 20 of Suppl. Moynihan Decl. Moreover, as plaintiffs point out, in the report on California, *see* Defs.' Ex. HH, Parkers' underlying data was from the Attorney General's investigation of Pearl Vision in which investigators posed as patients without real problems. Because the investigators had no real problems, they required less time for an exam. Decl. of Richard Bennett at ¶ 37.[9]

In sum, these two reports fall short of establishing that there remains a genuine issue of fact regarding the quality of care by optometrists associated with chains as compared to optometrists who dispense eyewear.[10] Moreover, and perhaps most

---

**9.** A third reason is that the report entitled, "The Detection of Selected Eye Conditions", Defs.' Ex. FF–21, only looked at New York City. New York has a regulatory scheme that is different and distinct from California. *See* N.Y. Laws §§ 7101 et seq.; N.Y. Comp.Codes R. & Regs. tit. 8, §§ 66.1. Given that the laws are different, comparing optometry practice in New York as compared to California may well be like comparing apples and oranges.

**10.** It is important to recall that it is insufficient to simply tender an opposing view. Rather the opposing party must tender facts which demonstrate that the dispute is genuine, i.e. that a reasonable trier of fact could return a verdict for the nonmoving party.

importantly, even if the court were to accept Parker's representations as true (that there is some variance between settings), as discussed herein, defendants fail to establish that there are no non-discriminatory alternatives which would address these concerns. In short, no genuine dispute exists.

There is a second problem with defendants' evidence. Defendants maintain that public health is the legitimate interest that the challenged laws seek to protect. Yet, the record is essentially silent as to how the practices identified by defendants actually harm the public's health. In other words, defendants state that public health is its main concern, however, there is no evidence which links the complained of practices to actual harm to the public's health. For example, defendants do not explain how short eye exams harm a patients' health, or how prescribing only LensCrafters eyewear endangers health. Similarly, there is no evidence that "transitioning" customers from an exam to the store area threatens the public's health.

As mentioned earlier, one of the few instances in which the Supreme Court has found that discriminatory regulations pass strict scrutiny is when public health is at issue. See e.g., Maine, 477 U.S. at 133, 106 S.Ct. 2440. Here, there is simply no evidence that there are significant health risks that the challenged laws protect against. On summary judgment, the court is to draw all reasonable inferences in favor of the non-moving party. See Matsushita, 475 U.S. at 587, 106 S.Ct. 1348. Drawing an inference that the practices cited to by defendants cause harm to the public without evidence to support that fact is not a reasonable inference. As I have repeatedly noted "inferences are not drawn out of the air, and it is the opposing party's obligation to produce a factual predicate from which the inference may be drawn." See Richards v. Nielsen Freight Lines, 602 F.Supp. 1224, 1244–45 (E.D.Cal. 1985), aff'd, 810 F.2d 898, 902 (9th Cir. 1987).

For the reasons discussed, there is no evidence that the quality of eye care varies by practice setting. Moreover, there is no evidence that the practices that defendants complain of actually harm the public's health.

It therefore follows that the defendants' justification for the challenged law (that no other laws can protect the public's health) fails. Stated somewhat differently, defendants cannot establish that the challenged laws are not "a 'last ditch' effort to solve the problem after nondiscriminatory alternatives have proved unfeasible." Hughes, 441 U.S. at 323, 99 S.Ct. 1727.

This conclusion is consistent with established dormant Commerce Clause doctrine. For example, in striking down laws restricting in-state treatment and disposal of hazardous waste generated in other states, the Fourth Circuit found that "[t]here is no basis to distinguish out-of-state waste from domestic waste over concern for citizens health, safety, and welfare ... Hazardous waste is equally dangerous whether generated within South Carolina or out-of-state." Envtl. Tech. Council v. Sierra Club, 98 F.3d at 786; see also Chemical Waste Management, Inc. v. Hunt, 504 U.S. 334, 344–45, 112 S.Ct. 2009, 119 L.Ed.2d 121 (1992)(holding that hazardous waste's danger to the health and safety of Alabama's citizens "does not vary with the point of origin of the waste"). Similarly, in the case at bar, defendants fail to establish that the public's health is in greater danger when receiving care from an optome-

Anderson v. Liberty Lobby Inc., 477 U.S. 242, 248–49, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986), Cline v. Industrial Maintenance Engi-

neering Co., 200 F.3d 1223, 1228 (9th Cir. 2000).

trist affiliated with a chain as compared to receiving care from a dispensing optometrist.

In *Oregon Waste Systems, Inc.*, 511 U.S. at 101, 114 S.Ct. 1345, the Supreme Court addressed the constitutionality of an Oregon law imposing a $2.50 per ton surcharge on in-state disposal of solid waste generated in other states in comparison to a fee $0.85 per ton on disposal of waste generated within Oregon. The Supreme Court concluded that the "respondents have not offered any safety or health reason unique to nonhazardous waste from other States for discouraging the flow of such waste into Oregon." *Id.* at 101, 114 S.Ct. 1345. The Supreme Court's reasoning applies with equal force here. Defendants in the case at bar have not offered any health benefits or disadvantages that are unique to optometrists who associate with a chain. In fact, it appears that the potential harm to patients exists irrespective of the setting.[11]

### b. The Knox–Keene Act as an Example of a Non–Discriminatory Alternative

Prior to the California Supreme Court's ruling in *People v. Cole*, some out of state optical chains such as LensCrafters had offered one-stop shopping in California by associating with Knox–Keene plans. Lovejoy Dep. at 23:16–22, Ex. G of Moynihan Decl. As explained previously, these specialized health care service plans are a type of HMO licensed under the California Knox–Keene Health Care Service Plan Act of 1975, Health & Safety Code section 1340, et seq. Knox–Keene plans employ or contract with optometrists to provide optometric services to plan members. Some interstate optical chains leased space in their California stores to Knox–Keene plans that provided optometric services.

The Act imposes numerous requirements on licensed plans to ensure that commercial interests do not interfere with the professional judgment of health care providers. For example, Knox–Keene plans must employ a medical director and must establish and adhere to a quality assurance program. Cal. Health & Safety Code § 1370. Similarly, Knox–Keene plans must make extensive disclosures, including medical and fiscal audits, to the DMHC. *Id.*, §§ 1351, 1380, 1382, 1384; Cal.Code of Regs., tit. 28, §§ 1300.84.06, 1300.84.2, 1300.84.3.

Plaintiffs assert that these relationships have enabled out of state optical companies to compete in California with dispensing optometrists. Plaintiffs also submit that the Knox–Keene scheme is a less restrictive, non-discriminatory alternative to the challenged restrictions. *See* Pls.' Mot. for Sum. J. at 11.

Defendants' argue in their opposition that the Knox–Keene plan is not an alternative because the California Fourth District Court of Appeals held that the Knox–Keene Plan is not exempt from the restrictions articulated in the challenged laws. As previously noted, since the parties submitted the pending motions, the California Supreme Court decided *People v. Cole*, 38 Cal.4th 964, 44 Cal.Rptr.3d 261, 135 P.3d 669 (2006), holding that the Knox–Keene Act did not exempt optical companies from the challenged laws at issue in this case.

The question before the California Supreme Court was whether the legislature intended for there to be an exception to the challenged laws for out-of-state optician companies affiliated with Knox–Keene plans. The Supreme Court did not address whether the underlying laws themselves (which are the subject of this litiga-

---

11. Being an eyeglass wearer myself, the conclusion that eye care may well be shoddy wherever provided, is, to say the least, cold comfort.

tion) violated the dormant Commerce Clause. Thus, to hold that the underlying laws violate the Commerce Clause would in no way contradict the holding of the California Supreme Court.

Moreover, this court's purpose in discussing the Knox–Keene Act is merely to demonstrate that there are non-discriminatory schemes which the State could adopt and which would address the health interests of the State. The court is not endorsing the Knox–Keene Act arrangements per se, but merely discussing a regulatory scheme which is an example of a non-discriminatory alternative to the challenged regulations.

For these reasons, the court finds that defendants have failed to demonstrate issues of fact regarding whether the laws are justified by a valid factor, and if so, that there are no neutral alternatives available. *Envtl. Tech. Council v. Sierra Club*, 98 F.3d at 786.

## V.

## CONCLUSION

Accordingly, the court concludes that the challenged laws substantially effect and discriminate against interstate commerce and therefore are subject to strict scrutiny under the dormant Commerce Clause. Although California has legitimate interests in regulating the provision of health services, defendants have failed to meet its burden of showing that it has no other means to advance its legitimate interests. The court therefore finds that the challenged laws violate the dormant Commerce Clause. The court orders as follows:

1. Plaintiffs' motion for summary judgment as to discriminatory effect is GRANTED.

2. Plaintiffs' motion for summary judgment as to nondiscriminatory alternatives is GRANTED.

3. Defendants' motion for summary judgment is DENIED.

4. Requests to file amicus briefs are DENIED.

5. The motions to strike filed by both defendants and plaintiffs are DENIED.

IT IS SO ORDERED.